**MOUNT ELLIOTT CEMETERY ASSOCIATION, Plaintiff–Appellant,**

v.

**CITY OF TROY, Defendant–Appellee.**

No. 97–2146.

United States Court of Appeals, Sixth Circuit.

Argued Jan. 28, 1999.

Decided March 24, 1999.

Joseph F. Galvin (argued and briefed), Miller, Canfield, Paddock & Stone, Detroit, Michigan, Thomas J. McCarthy (briefed), Monaghan, LoPrete, McDonald, Yakima & Grenke, Bloomfield Hills, Michigan, for Plaintiff-Appellant.

Joseph Aviv (argued and briefed), Matthew F. Leitman (briefed), Bruce L. Segal (briefed), Miro, Weiner & Kramer, Bloomfield Hills, Michigan, for Defendant-Appellee.

Before: MERRITT, GUY, and MOORE, Circuit Judges.

## OPINION

RALPH B. GUY, JR., Circuit Judge.

Plaintiff, Mount Elliott Cemetery Association, appeals from the entry of summary judgment in favor of defendant, the City of Troy (City), in this action to challenge the City Council's refusal to rezone certain property for use as a Catholic cemetery. Plaintiff alleges that the denial of the zoning request violated the right to free exercise of religion and denied it equal protection as guaranteed by the United States Constitution and 42 U.S.C. § 1983.[1] Plaintiff also claims that the City's action constituted exclusionary zoning in violation of the Michigan City and Village Zoning Act. *See* MICH. COMP. LAWS ANN. § 125.592 (West 1997). Based on our review of the record and the arguments on appeal, we find that the City was entitled to summary judgment and affirm.

## I.

Plaintiff, Mount Elliott Cemetery Association (Association), a non-profit corporation run by its trustees, owns and operates four existing Catholic cemeteries in the metro-Detroit area: Mt. Elliott Cemetery in Detroit; Mt. Olivet Cemetery in Detroit; All Saints Cemetery in Waterford Township; and Resurrection Cemetery in Clinton Township. The Association was established in 1864 when the Roman Catholic Bishop of the Diocese of Detroit deeded property in trust to the Association to be maintained and operated as a Catholic cemetery, with the proviso that any funds received from its operation be used to maintain and establish future Catholic cemeteries.

The Association's general manager, Patrick Farrell, testified that the Roman Catholic Church is not involved in the management or operation of the Association or its cemeteries. In fact, Farrell testified that Holy Sepulchre Cemetery in Southfield, which is owned by the Diocese, is its competition. The Association does not provide religious services in connection with burials in its cemeteries, but establishes, maintains, and sells plots in consec-

---

1. Plaintiff also alleged that the City violated the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb *et seq.*, but abandoned that claim after the United States Supreme Court held RFRA unconstitutional. *See City of Boerne v. Flores*, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997). Although plaintiff alleged a separate claim under 42 U.S.C. § 1983 (Count IV), § 1983 is not a source of substantive rights. *See Baker v. McCollan*, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979).

rated ground for the burial of the Catholic faithful and their families (Catholic or non-Catholic). The Association is not a part of the Church or the Diocese, but must operate the cemeteries under the rules and regulations of the Archdiocese.

In 1992, Farrell examined the geographical area that was being served by Resurrection Cemetery and concluded that it was not serving Catholics in Troy or the surrounding communities in Oakland County. Although the Association had expected to serve families within a twelve-mile radius of Resurrection Cemetery, Farrell concluded that they were only reaching families within about an eight-mile radius. He looked at the geographical reach of the Association's existing cemeteries to identify an area for a new cemetery where the radius from the property would "mesh" with its other properties. Farrell selected Troy for the development of a new cemetery because of its location in relation to the Association's existing cemeteries.

In 1993, the Association purchased adjacent parcels of land totaling about 88 acres located in Troy, east of Rochester Road and south of South Boulevard. Only about 55 acres of the property could be used as a cemetery, the rest falling in wetland and floodplain areas. The Association knew before it purchased the property that it would have to be rezoned from R–1D, single family residential, to the C–F, community facilities, district in order to develop the land as a cemetery.

When the City of Troy was incorporated in 1955, there were five small 19th-century cemeteries and one very large non-denominational cemetery, White Chapel Memorial Cemetery (White Chapel), within the City limits. In 1957, the City adopted its zoning ordinances, including the one-family residential districts (R–1A to R–1E) which "are designed to be the most restrictive of the residential Districts as to use." The ordinance "grand-fathered" existing cemeteries that lawfully occupied land zoned R–1 as a "principal permitted use." The City established the C–F district in 1977, which includes among the principal permitted uses: "Cemeteries, in locations where such would not abut platted and developed residential land." Those seeking to rezone property to a C–F district are required to conform to the requirements for rezoning any other property.

> The C–F, Community Facilities, District is intended to provide for those public or quasi-public institutional uses necessary to serve the cultural, educational, and, to some extent, the physical needs of the residential community. The unique nature and requirements of the uses contained within this District, and their need for location within the residential portion of the community, warrant the establishment of a separate zoning classification which contains land use controls to insure that such uses will be fully compatible with adjacent land uses and not contrary to the spirit and purpose of this ordinance.

While there is property in Troy zoned C–F, it is undisputed that no areas were set aside for use as C–F districts.

On June 14, 1994, the Planning Commission (Commission) recommended that the Association's first request to rezoned the property be denied (6–1), despite the recommendation of the City's planning director, Laurence Keisling, that it be approved. The Commission found that the proposed use (1) would erode the City's tax base; (2) was an inappropriate use for the C–F district, as it would not serve the general public; and (3) was a "quasi-commercial" use. The City attorney confirmed that the C–F district is the proper zoning classification for cemeteries and that the ordinance does not exclude cemeteries affiliated with religious organizations.

The Association revised its rezoning request to exclude platted lots to the north of the property, proposing that about 57 acres be rezoned to C–F and about 21 acres be rezoned to E–P "in recognition

both of the large wooded floodplain area in the southeasterly portion of the property, and the need for a buffer or separation between the potential developed C–F zoned cemetery site and adjacent residential properties."

As is reflected in a memo from Keisling to the City manager, the Commission had two meetings to consider the revised request. Keisling strongly recommended its approval to discourage the spread of commercial uses from neighboring cities to the north. The Association presented a traffic study showing that residential development would generate much more morning and evening traffic than a cemetery. One of the commissioners disagreed with the conclusion that a cemetery would not have a negative impact on traffic in the area based on his experiences working near White Chapel. A number of potential neighbors also were present at the meeting, some of whom expressed concerns about the impact on traffic, the adequacy of the buffer area, the effect on property values, and the appropriateness of the use. After discussing the proposal, the Commission again recommended that the rezoning request be denied (6–2) for the following reasons: (1) insufficient transition or buffer areas; (2) reduction of potential tax base; and (3) potential traffic congestion.

At a regular meeting held May 22, 1995, the City Council followed the recommendation of the Planning Commission and denied the rezoning request by a vote of 6–1, offering the following six reasons in support of denial: (1) insufficient transition or buffer areas proposed, making the application of C–F zoning for cemetery purposes at this location improper; (2) reduction of potential tax base; (3) potential traffic congestion on Rochester Road related to uses permitted in C–F districts; (4) E–P zoning buffer was a clear circumvention of the intent; (5) it "doesn't meet the spirit of the ordinance"; and (6) abuts developed land and is not considered a quasi-public use.

The Association alleges that Council questioned the exclusionary practices of Catholic cemeteries and suggested that Catholics could be buried at the non-denominational White Chapel cemetery. The Association had, however, presented its proposal as one that addressed a need for a Catholic-only cemetery to serve residents of Troy and its surrounding communities. There is also no dispute that White Chapel, located only three and one-half miles from the property, accommodates the burial of Catholics in blessed ground with full Catholic burial rites. White Chapel is a large cemetery with a life expectancy of 100 to 150 years or more, due to the increasing rate of cremation, and estimates that a third of its burials are of Catholics. In addition, another non-denominational cemetery, Christian Memorial Cultural Center, which is located about five miles from the property in Rochester Hills, likewise accommodates the burial of Catholics, has an expected life of about 200 years, and estimates that about 35 percent of its burials are of Catholics.

The Association filed this action and after the close of discovery the City filed three separate dispositive motions seeking dismissal and/or summary judgment. On September 23, 1997, the district court entered three orders: (1) granting in part the City's motion to dismiss the free exercise claim for lack of standing; (2) granting the City's motion for summary judgment on the equal protection claims; and (3) granting the City's motion for summary judgment on the exclusionary zoning claim. This appeal followed.

## II.

We review de novo the district court's grant of summary judgment. *See Smith v. Ameritech,* 129 F.3d 857, 863 (6th Cir. 1997). In accordance with Fed.R.Civ.P. 56(c), summary judgment is appropriate when there are no issues of material fact in dispute and the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the court must view the factual evidence in the light most favorable to the non-moving

party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-moving party, however, may not rest on its pleadings, but must come forward with evidence from which a rational trier of fact could find in its favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 252, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## A. Free Exercise of Religion

▮ The Free Exercise Clause of the First Amendment, applicable to the states through the Fourteenth Amendment, *see Cantwell v. Connecticut,* 310 U.S. 296, 303, 60 S.Ct. 900, 84 L.Ed. 1213 (1940), provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. CONST. AMEND. I. "The free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Department of Human Resources of Oregon v. Smith,* 494 U.S. 872, 878, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). The exercise of religion often involves not only belief,

> but the performance of (or abstention from) physical acts: assembling with others for a worship service, participating in sacramental use of bread and wine, proselytizing, abstaining from certain foods or certain modes of transportation. It would be true, we think (though no case of ours has involved the point), that a State would be "prohibiting the free exercise [of religion]" if it sought to ban such acts or abstentions only when they are engaged in for religious reasons, or only because of the religious belief that they display.

*Id.* The First Amendment does not, however, prevent the government from regulating behavior associated with religious beliefs. In *Smith,* the Supreme Court held that the "right of free exercise does not

relieve an individual of the obligation to comply with a 'valid and neutral law of general applicability on the ground that the law proscribes (or prescribes) conduct that his religion prescribes (or proscribes).'" *Id.* at 879, 110 S.Ct. 1595 (quoting *United States v. Lee,* 455 U.S. 252, 263 n. 3, 102 S.Ct. 1051, 71 L.Ed.2d 127 (1982) (Stevens, J., concurring in judgment)). We find that the zoning ordinance is a "neutral law of general applicability" and affirm the entry of summary judgment on the grounds that the free exercise claim fails as a matter of law. In addition, we find the district court correctly concluded that the Association did not have standing to assert the free exercise claim. Although an alternative basis for affirmance, we nonetheless address the standing issue first.

### 1. Standing

▮ The Association alleges that the City's actions violated the First Amendment and 42 U.S.C. § 1983 by placing a substantial burden on the free exercise of religion by both the Association and Catholics who might wish to be buried in the proposed Catholic cemetery. The Association does not allege any religious beliefs or convictions of its own, is not part of the Church or Diocese, and is not a religious-member organization. It is a non-profit cemetery association that markets burial plots to Catholics. The district court found that even if the Association "had professed its own religious beliefs, its proposed activities of constructing and operating a Catholic cemetery are purely secular acts and not an exercise of religion," relying upon *Lakewood, Ohio Congregation of Jehovah's Witnesses, Inc. v. City of Lakewood,* 699 F.2d 303 (6th Cir.1983). The district court found, therefore, that the Association did not have standing to assert a free exercise claim on its own behalf. We agree.[2]

---

2. The City argued that a corporation can never have a legally protected right of free exercise because it is a "purely personal" right

limited to the protection of individuals, relying upon *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 778 n. 14, 98 S.Ct.

In *Lakewood,* a pre-*Smith* case, the Congregation of Jehovah's Witnesses challenged the zoning restrictions that prevented it from building a place of worship on property zoned for residential use. The court rejected the claim, finding no evidence that the construction of Kingdom Hall was a ritual, a "fundamental tenet," or a "cardinal principle" of its faith, and concluded that "[a]t most the Congregation can claim that its freedom to worship is tangentially related to worshiping in its own structure. However, building and owning a church is a desirable accessory of worship, not a fundamental tenet of the Congregation's religious beliefs." *Id.* at 307.

With respect to Catholic-only burial, the parties' expert witnesses agreed that the Church does not view burial in a Catholic cemetery to be a fundamental or essential tenet of the religion; that Canon law does not require burial in a Catholic cemetery; and that there are no religious consequences to burial in a non-denominational cemetery with full Catholic blessing and rites rather than in a Catholic-only cemetery. The evidence showed that the Church prefers and encourages burial in a Catholic cemetery to witness the belief in resurrection and the community of the faithful and to have cemeteries become an extension of the parish community. Yet, the evidence does not dispute the testimony of Father Henchal, the City's expert on the teachings of the Church regarding Catholic burial, that Catholics can freely exercise their religion whether or not they have a Catholic cemetery near them. We agree with the district court that the Association's development of a Catholic cemetery is not an exercise of religion and, therefore, it cannot maintain a claim for violation of the right to free exercise.

■■ The Association also argues that the district court erred in finding it had no standing to assert a free exercise claim on behalf of third-party Catholics who might choose to be buried in the proposed cemetery. To assert a claim on behalf of a third party, a plaintiff must show that (1) it has suffered an injury in fact; (2) it has a close relationship to the third party; and (3) there is some hindrance to the third party's ability to protect his or her own interests. *See Powers v. Ohio,* 499 U.S. 400, 410–11, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991). In addition, the Supreme Court has indicated that "[s]ince 'it is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion,' the claim asserted here is one that ordinarily requires individual participation." *Harris v. McRae,* 448 U.S. 297, 321, 100 S.Ct. 2671, 65 L.Ed.2d 784 (1980) (quoting *Abington Sch. Dist. v. Schempp,* 374 U.S. 203, 223, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963)).

The Association relies on the affidavit of a Catholic resident of Troy, who is an attorney, stating that he would choose to be buried in the Catholic cemetery closest to his home, family, and parish as part of a "logical extension of our faith." This individual, however, did not claim that the City has burdened his exercise of religion, or discriminated against Catholics. There was also no showing of any hindrance to his bringing a claim on his own. *Cf. Planned Parenthood Association of Cincinnati v. Cincinnati,* 822 F.2d 1390, 1394, 1396 (6th Cir.1987). The Association also relies upon *United States Department of Labor v. Triplett,* 494 U.S. 715, 720, 110 S.Ct. 1428, 108 L.Ed.2d 701 (1990), to support its claim of *jus tertii* standing. In this case, however, the City's zoning decision did not prevent the Association from entering a contract with potential custom-

1407, 55 L.Ed.2d 707 (1978) (corporation has First Amendment right of free speech). We do not address this unsettled question as it is not necessary to the resolution of this case. *See Church of Scientology of California v. Ca-*

*zares,* 638 F.2d 1272, 1280–1 n. 7 (5th Cir. 1981) (discussing but not deciding whether corporation has an institutional right to free exercise of religion).

ers for burial in one of its other Catholic cemeteries. Certainly, the Association has not shown that its potential customers have a free exercise right to be buried in a Catholic cemetery close to their homes.[3]

## 2. Free Exercise Claim

The City argues that summary judgment was properly granted on the free exercise claim because, as discussed above, the construction and operation of a cemetery is not an exercise of religion. Also, although not decided by the district court, the City argues that under *Smith* the free exercise claim fails because the zoning ordinance is a "neutral law of general applicability." If it is not a neutral law of general applicability, it is subject to strict scrutiny. *See Smith*, 494 U.S. 872, 110 S.Ct. 1595; *Church of the Lukumi Babalu, Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993); *Kissinger v. Board of Trustees*, 5 F.3d 177 (6th Cir.1993). The applicability of *Smith* to zoning decisions was recognized in *Rector, Wardens and Members of Vestry of St. Bartholomew's Church v. City of New York*, 914 F.2d 348 (2nd Cir. 1990) (church prevented by Landmarks Law from building a new office building in place of its Community House to provide space and generate revenue to support its ministerial and community activities), and *Cornerstone Bible Church v. City of Hastings*, 948 F.2d 464 (8th Cir.1991) (zoning ordinance excluded churches and other non-profits from commercial and industrial zones). We find *Smith* applies to the free exercise challenge to the zoning decision in this case.

The issues of "neutrality" and "general applicability" were discussed by the Court in *Lukumi Babalu*, a case involving the adoption of ordinances directed at outlawing the ritual sacrifice of animals, a fundamental tenet of the Santeria faith. A law is not neutral if the object of the law, whether overt or hidden, is to infringe upon or restrict practices because of their religious motivation. *See Lukumi Babalu*, 508 U.S. at 535, 113 S.Ct. 2217. The requirement that the law be of general applicability protects against unequal treatment which results "when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation." *Id.* at 542–43, 113 S.Ct. 2217. In this case, we are convinced that the evidence supports only one conclusion, that the City of Troy's ordinances governing residential and community facilities districts are neutral laws of general applicability. As a result, we find that judgment was properly entered in favor of the City with respect to the free exercise claim.

## B. Equal Protection

The Association claims the City's zoning ordinances, facially and as applied, violate equal protection and 42 U.S.C. § 1983. The district court granted summary judgment to the City on this claim. With respect to the facial challenge, the Association argues that the classification of existing cemeteries among "primary permitted uses" in single family districts when the City adopted its zoning ordinances in 1957 was not rationally related to a legitimate governmental interest. *See Curto v.*

---

**3.** The Association also argues for the first time on appeal that it has standing to sue on behalf of its "members," who are those persons who purchased the right to burial in ground owned by the Association. *See* MICH. COMP. LAWS ANN. § 456.5 (West 1989). The City correctly points out that the Association disavowed any claim of standing on behalf of its members on the apparent belief of its general manager that it had no members. Even if the Association were permitted to assert this as a basis for standing at this juncture, it is without factual basis. Farrell testified that the Association had not marketed or sold plots for the proposed cemetery in Troy. The Association offers potential members, or holders as they are called in the Association by-laws, plots in already developed areas. Thus, there could be no members holding rights to burial in the proposed cemetery.

*City of Harper Woods,* 954 F.2d 1237, 1244–5 (6th Cir.1992).

The Association specifically claims the "grand-fathering" did not further a legitimate governmental interest because Michigan's City and Village Zoning Act already provided that pre-existing non-conforming uses may be continued. *See* MICH. COMP. LAWS ANN. § 125.583a(1) (West 1997). Regardless, it is neither arbitrary nor irrational to expressly provide that pre-existing cemeteries would be a "permitted use" in the newly created R–1 residential districts. The Association also argues that treatment of pre–1957 cemeteries and the restrictions imposed upon new cemeteries under the zoning for C–F districts demonstrate that the City's illegitimate purpose was to keep new cemeteries out of Troy. To the contrary, we agree with the district court that the Association has not shown that the City acted irrationally or arbitrarily by either including pre-existing cemeteries as permitted uses in a residential district, or by providing that new cemeteries could be established only in C–F districts.

■■■■ Next, the Association argues that the City's ordinances, as applied, impermissibly distinguish between secular and religious cemeteries and, therefore, violate equal protection. Equal protection is "essentially a direction that all persons similarly situated be treated alike." *City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). When a statute or ordinance uniquely impacts adversely a suspect class or invades a fundamental right, the rigorous strict scrutiny standard will apply, but when it does not the ordinance is tested under the rational relationship standard. *Id.* at 440, 105 S.Ct. 3249. The district court, treating the claim as one of selective treatment, required the plaintiff to show that (1) it was treated differently than others who were similarly situated and (2) the selective treatment was based on an impermissible consideration such as religion. Finding that the Association failed

to show its request was treated differently than other similarly-situated requests, or evidence that the rezoning request was denied as a result of intentional discrimination, the district court granted summary judgment to the City.

The Association argues that it was treated differently than White Chapel cemetery, which operates on property zoned R–1B. White Chapel, however, was established in 1927, long before the City was even incorporated, and is a pre-existing lawfully operated cemetery expressly permitted under the R–1 zoning ordinance. The Association also alleges that it was treated differently than similarly-situated land owners: specifically, a synagogue; a restaurant; and a fruit market. Yet, a non-moving party may not rest upon its pleadings and allegations but, rather, must come forward with evidence to create a genuine issue of material fact for trial. Not only are allegations of the Association in this regard made without proper citation to the record, but they are also made without any evidentiary basis. We find that the Association has failed to demonstrate a question of fact concerning whether its rezoning request was treated differently than similarly-situated requests and, therefore, we need not apply the rational basis test. *See Silver v. Franklin Twp., Bd. of Zoning Appeals,* 966 F.2d 1031, 1036 (6th Cir.1992).

The Association also argues that the City denied its rezoning request as a result of intentional discrimination against Catholic *burial practices.* While there is evidence that the Mayor of Troy, Jeanne Stine, was heard to comment that she would approve the cemetery "over [her] dead body," such a comment does not demonstrate prejudice against Catholics, *or* Catholic burial practices. Further, since the mayor represents only one of the six votes against the rezoning request, the statement could not show that the City Council was motivated by discrimination. *See Kawaoka v. City of Arroyo Grande,* 17 F.3d 1227, 1239 (9th Cir.1994) (racial com-

ment by one council member not attributable to entire council, which voted unanimously to adopt the challenged land use plan).

Finally, the Association would infer from the City Council's determination that the proposed use was not in accordance with the "spirit of the ordinance" or a "general public use" that its rezoning request was denied because of the denominational exclusionary burial practices of Catholics. While Keisling testified that he believed the Council's findings referred to the concern that the cemetery would not serve the total community, this interpretation fails to show the rezoning request was denied on the basis of the denominational nature of the proposed cemetery. The ordinance sets out the intent of the C–F district and states that the separate classification "contains land use controls to insure that such uses will be fully compatible with adjacent land uses and *not contrary to the spirit and purpose of this ordinance.*" (emphasis added). Again, it cannot be ignored that the Association presented its request as addressing a need for a Catholic-only cemetery in the Troy area. The City contends that given the existence of six cemeteries in the City, including the 200–acre White Chapel cemetery located only three and one-half miles from the property, it would not meet the spirit of the ordinance to "serve the cultural, educational, and, to some extent physical needs of the residential community" to permit a new 80–acre cemetery within the City. We agree with the district court that the Association failed to show that the City denied the rezoning request out of a motive to discriminate based on religion.

## C. Exclusionary Zoning

■ The Association claims that the City's denial of the rezoning request to permit construction of a Catholic-only cemetery on the property constitutes unlawful exclusionary zoning. Michigan's City and Village Zoning Enabling Act provides in pertinent part:

A zoning ordinance or zoning decision shall not have the effect of totally prohibiting the establishment of a land use within a city or village in the presence of a demonstrated need for that land use within either the city or village or the surrounding area within the state, unless a location within the city or village does not exist where the use may be appropriately located or the use is unlawful.

MICH. COMP. LAWS ANN. § 125.592 (WEST 1997). Thus, to make a claim of exclusionary zoning, the Association must establish both that (1) the use sought does not occur within the City's boundaries or within close geographical proximity, and (2) there is a demonstrated need for the proposed use. *See Gustafson v. City of Lake Angelus,* 76 F.3d 778, 790 (6th Cir.1996); *Guy v. Brandon Twp.,* 181 Mich.App. 775, 450 N.W.2d 279, 284 (1989); *Fremont Twp. v. Greenfield,* 132 Mich.App. 199, 347 N.W.2d 204 (1984).

There can be no dispute that cemetery use of land exists both within the City of Troy and the surrounding area. Rather, the Association contends that the statute was violated because the City prohibited Catholic-only cemetery land use. We disagree. As the district court concluded, whether there is exclusionary zoning must be evaluated based on the use of the land not the user. Moreover, about a third of the burials at both White Chapel cemetery in Troy and Christian Memorial cemetery in Rochester Hills are burials of Catholics. Thus, the use of land as a cemetery for the burial of Catholics occurs in Troy and the immediate vicinity.

The district court further found that the Association had failed to demonstrate the need for another cemetery, Catholic or otherwise, within the City's borders or the surrounding area. In addition to the two large non-denominational cemeteries mentioned above, there are five Catholic cemeteries in close geographic proximity: Holy Sepulchre, which is eight miles from Troy; All Saints, which is 15 miles from Troy

(and advertises in Troy-area parishes); Resurrection, which is seven miles from Troy; Mt. Olivet, which is 10 miles from Troy; and Mt. Elliott, which is 16 miles from Troy. Except for Holy Sepulchre, these Catholic cemeteries are all owned and operated by the Association. While the Association makes a case that there are Catholics living in Troy and its surroundings communities who live or worship within its target market area of six miles and to whom it could probably sell burial plots, that does not amount to exclusionary zoning in violation of the statute.

**AFFIRMED.**