**TANDY CORPORATION, a Delaware Corporation, Plaintiff,**

v.

**CITY OF LIVONIA, a Michigan Municipal Corporation, Defendant.**

**No. 97–74735.**

United States District Court, E.D. Michigan, Southern Division.

Nov. 10, 1999.

Alan M. Greene, Zora E. Johnson, Dykema Gossett, Bloomfield Hills, MI, for plaintiff.

Sean P. Kavanagh, Kathy White, City of Livonia Law Dept., Livonia, MI, Owen J. Cummings, Cummings, McClorey, Livonia, MI, for defendant.

## OPINION AND ORDER

FEIKENS, District Judge.

### I. INTRODUCTION

Plaintiff Tandy Corporation (Tandy) was the owner of a 14–acre parcel of land in Livonia, Michigan. The land was bought by Tandy through a purchase agreement in which Tandy agreed to buy the property only in the event that a pending rezoning of the property—from professional office use to general commercial use—was successfully completed. In 1995, the Wayne County Circuit Court upheld the pending rezoning and Tandy purchased the property. In 1997, however, defendant City of Livonia ("Livonia" or "the City") determined to rezone the property again—back to professional office use. Over Tandy's objection, the property was rezoned.

Plaintiff filed the present action, alleging takings and substantive due process claims under both the Michigan and federal constitutions. Defendant filed a motion for summary judgment as to both counts, arguing that, as a matter of law, the City's actions constituted neither a regulatory taking nor a violation of plaintiff's substantive due process rights. In response, plaintiff filed a cross-motion for summary judgment, contending that the City's actions compel a finding of liability on either or both of these theories.

### II. BACKGROUND

The subject of this lawsuit is a parcel of land approximately 14 acres in size located in northwest Livonia, Michigan. The property is bordered on the west by I–275, a north-south bypass expressway, on the north by an Embassy Suites Hotel, on the east by Victor Parkway, a north-south road, and on the south by two restaurants.

The subject property was designated, in a master plan by Livonia from the early 1980's, as part of "Victor Corporate Park." Pursuant to the master plan, prior to December 1994, most of the property was

zoned for professional office use; a relatively narrow strip across the north end of the property, abutting the Embassy Suites Hotel, was zoned for high-rise commercial use.

## A. Livonia Zones the Property from Office Use to Commercial Use

In December 1993, Livonia received a request from the then-owner of the property, Victor Corporate Park, L.P., to rezone the property from professional office use to general commercial use:

Having been actively involved in the marketing and promotion of the Victor site since 1988, we must reluctantly acknowledge that the vision originally conceived for the Park is now only a very remote possibility. Influences beyond our control will not permit us to develop the property according to our original master plan. As such, we must look to the opportunities which best suit the site in light of the current market and development trends.

. . . .

Clearly, it is not in the best interest of the developer or the City to see this property remain vacant and unimproved. But that is precisely what will happen if we do not reconsider our original vision for a high rise office park. A return on the investment that we made in Victor Corporate Park and its development potential must now be realized.

(Brief in Support of Defendant's Response to Plaintiff's Motion for Partial Summary Judgment, Ex. A.) The initial proposal for rezoning contemplated that a 110,7000 sq. ft. "Builder's Square" store would be built on the property.

As was customary, the proposal to rezone the property was first submitted to the Livonia City Planning Department for a report. That report noted:

While it is true that the market for large office users in particular has deteriorated, the Victor Park concept has been established by strategically locating the Embassy Suites Hotel, the Victor V Office building and the Cantina Del Rio restaurant. Because of the lack of an office market we see the potential for some commercial services which would compliment [sic] the above described existing and proposed uses. Those services could include another restaurant and certain special retail and service facilities which could cater to hotel and office users and customers. We do not, however, believe that a big box user such as Builder's Square is compatible with the established uses in the area, nor do we believe the current street system was designed to accommodate the traffic generated by such a large retail facility. Furthermore, in our opinion, such a use would destroy the Victor Park concept and would undoubtedly attract other complementary commercial users, and you would be faced with similar requests for changes of zoning in the future on adjacent or nearby property.

(Brief in Support of Defendant's Response to Plaintiff's Motion for Partial Summary Judgment, Ex. B.) The City Planning Department recommended that the petition for rezoning be denied.

The proposal then went to a hearing before the Livonia City Planning Commission ("Planning Commission" or the "Commission"). At the hearing, numerous individuals expressed opposition to rezoning the plot to commercial use. Embassy Suites, which borders the subject plot to the north, opposed the change, as did Paine–Webber, which had signed a letter of intent to take up office space in the park. The Commission recommended that the rezoning proposal be denied.

That recommendation was appealed to the City Council (the "Council"). At the council hearing on February 16, 1994, both sides continued to debate the issue, prompting the city to refer the rezoning proposal to a committee for further discussion.

Victor Corporate Park continued to insist that rezoning from office use to commercial use was appropriate and necessary. Perceiving, however, that the principal impediment to the rezoning was wide spread opposition to the Builder's Square store, it withdrew that portion of the proposal. In its place, Victor Corporate Park apparently proposed that a restaurant be built on a 1.5–acre portion of the property[1] but did not specify any proposed uses for the balance of the property. On December 21, 1994, the rezoning from office use to commercial use was approved.

In February 1995, the owners of the Embassy Suites Hotel north of the property filed suit in Wayne County Circuit Court challenging the rezoning of the property. Both Victor Corporate Park and Livonia defended the rezoning, arguing that the change to general commercial use was an appropriate zoning decision.

Contemporaneous with the 1995 lawsuit, Tandy became involved with the development of the subject property. On March 28, 1995, Tandy signed a letter of intent with Victor Corporate Park, proposing to purchase the property and build an "Incredible Universe" store there. (An Incredible Universe store is a computer and electronics retail store that, according to Tandy, caters in part to corporate customers.) When, in May 1995, the Wayne County Circuit Court granted defendants' motion for summary judgment, Tandy entered into a purchase agreement for the subject property. The purchase agreement was conditioned on the dismissal with prejudice of the state court action. (*See* Plaintiff's Supplemental Brief in Support of Motion for Partial Summary Judgment, Ex. 4.)

In July 1995, the state court action was dismissed, and on July 31, 1995, Tandy closed on the purchase to the subject property, now zoned for general commercial use. Tandy paid approximately $6.1 million for the land. In September 1995, Tandy sought and received site plan approval for the Incredible Universe store. A building permit was issued, and Tandy began to grade the property for the building of the project in October 1995. For apparently unrelated economic reasons, however, Tandy failed to complete the Incredible Universe store. Instead, in late 1996, about a year after site preparations had begun, Tandy began to look for a buyer for the property. On December 12, 1996, Tandy entered into an agreement to sell the property to Jeffery Sobel for $7.25 million. The agreement contemplated that the property would be developed as commercial property.

## B. Livonia Rezones the Property Back to Office Use from Commercial Use

On April 16, 1997, less than two years after Tandy had purchased the property contingent upon the commercial zoning of the land, the city council, of its own initiative, proposed that the Tandy property be rezoned back to the office use classification. Rather than submit the matter to the City Planning Department, as they had when they considered the zoning issue in 1994, the City Council immediately referred the matter to the Planning Commission for a hearing. Curiously, the Planning Commission had, on April 15, 1997 (the previous day), already acted "pursuant" to the council's referral, scheduling a hearing for May 13, 1997.

On May 9, 1997, Tandy wrote a letter to the city requesting an adjournment of the May 13, 1997 hearing because of an apparent problem in receiving notice of the hearing. The request was denied. At the May 13, 1997 hearing, Tandy requested that the Commission "table" the consideration of the rezoning so that Tandy could

---

**1.** Prior to the 1994 rezoning, the property then at issue consisted of approximately 15.9 acres. After the property was rezoned in 1994, 1.5 acres was sold and a Lone Star Steakhouse restaurant was built on it, leaving the approximately 14 acres that is the subject of this lawsuit.

prepare an adequate response. Counsel for Tandy expressly stated that her client was not at the meeting and that she was not prepared to respond to the substance of the rezoning proposal. (Appendix to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiff's Motion for Partial Summary Judgment (hereinafter "Plaintiff's Appendix"), Ex. 12.) The Commission denied counsel's request to delay its final action on the rezoning issue. (*Id.*).

The minutes of the meeting reveal that the Commission instead pressed Tandy's counsel for a substantive argument, and when one could not be given, they moved on. Two former members of the Planning Commission (who had voted against the rezoning of the property to commercial in 1994) expressed their view that a mistake was about to be corrected. One other resident also expressed support for the rezoning of Tandy's property back to office use. (*Id.*). With these three statements as the only discussion, the Commission adopted the following resolution, apparently prepared in advance:

> RESOLVED that ... the Planning Commission does hereby recommend to the City Council that [the Tandy property be rezoned back to office use] for the following reasons:
>
> 1) That the proposed change of zoning will provide for one uniform zoning district for the subject property.
>
> 2) That the proposed change of zoning will provide for uses which are compatible to and in harmony with the surrounding uses in the area.
>
> 3) That the proposed change of zoning will provide for the continuation of the development of the Victor Corporate Park.

There is no indication in the minutes of the May 13, 1997 hearing that any of these reasons were discussed, explained, or supported by fact.

As a result of the Commission's recommendation, Jeffrey Sobel terminated his proposed purchase of the property.

The City Council considered the commission's recommendation at a hearing on July 16, 1997. Prior to the hearing, Tandy submitted what it describes as an extensive record against down-zoning the property, some of which has been provided to me. (Plaintiff's Appendix, Ex. 14). During the hearing, Tandy's attorney summarized those arguments. (Plaintiff's Appendix, Ex. 15 p. 4–7). The Council was unpersuaded, as indicated by the comments of two of the council members. Council member Feenstra expressed the opinion, among other things, that the property had "a lot more value" as professional office use property than as commercial use property. (*Id.*, at 8.[2] Council member Taylor expressed the opinion that circumstances surrounding the appropriate zoning of the Tandy property had changed in several respects, so that the rezoning was appropriate, (*Id.*, at 9), and at the end of his comments, he moved that the Council approve a resolution sending the proposal "to the Law Department to prepare the Ordinance." (*Id.*). That resolution was approved at the "Council's Regular Meeting" the next week, on July 21, 1997.

At that later meeting, the Council requested that the Planning Commission Director, John Nagy, "furnish information regarding the recovering office market as it relates to Livonia." (*See* Answer, Ex. C). On August 5, 1997, the Council received Nagy's response—a one-page excerpt from "The Friedman Report, Greater Detroit Office Market, January 1997". (*Id.*)

On August 23, 1997, the Council passed the ordinance prepared by the Law Department rezoning the Tandy property back to professional office use.

---

**2.** The minutes of the July 26, 1997 council meeting are attached as Appendix A. Feens-

tra's comments, in their entirety, are included therein.

## C. The Present Action

Based on this 1997 rezoning, and the alleged loss of value to the property that occurred because of the rezoning, Tandy filed suit. Count I of the First Amended Complaint sought a declaratory judgment that the rezoning was arbitrary and capricious and, presumably, for that reason void; Count II sought money damages based on a theory of a substantive due process violation; and Count III sought money damages based on a regulatory takings theory.

In March 1998, after cross-motions for summary judgment and partial summary judgment had been filed by Livonia and Tandy respectively, the parties agreed, at my suggestion, to stay this action and refer the case to Livonia's zoning board of appeals in an effort to resolve the case through the administrative process. That effort was unsuccessful.

Tandy did, however, continue to engage in ongoing efforts to at least partially resolve the case by attempting to find a buyer/developer for the property that would be acceptable to Livonia. In May 1999, Tandy closed on a sale of the property to Liberty Property Limited Partnership, a real estate investment trust, for $6.4 million. Liberty Property did not require that the property be zoned commercial in order to close the purchase.

At a status conference held in July 1999, I was apprised of these facts. Counsel for Livonia intimated that the sale of the property for $6.4 million – $0.3 million more than the 1996 purchase price—rendered plaintiff's claims moot. A briefing schedule was set and Livonia and Tandy again filed motions for summary judgment and partial summary judgment, respectively. While the parties agree that plaintiff's claim for declaratory judgment is rendered moot by the sale of the property, the parties essentially renew their arguments from the previous motions as to Counts II and III of the First Amended Complaint.

Defendant contends that (A) as to Count II, the substantive due process claim, (1) plaintiff lacked the requisite "property interest" in the 1994–5 re-zoning, and (2) in any event, Livonia's action was rationally related to legitimate land use concerns; and (B) as to Count III, the regulatory takings claim, (1) plaintiff cannot demonstrate that it was deprived of all economically viable use of the land, and (2) the challenged re-zoning substantially furthers a legitimate governmental interest. Tandy contends that (A)(1) it did possess the property interest necessary to sustain a substantive due process violation claim, and (A)(2) that Livonia's rezoning of the property back to professional office use was not rationally related to a legitimate land use. It also contends that a regulatory takings claim can be established as a matter of law despite the fact that it concedes that (B)(1) it was not deprived of all economically viable use of the land, because (B)(2) Livonia's rezoning did not substantially further a legitimate state interest.

The opinion will address the parties' contentions as to each of these four points. For the reasons that follow, I find that both parties' motions for summary judgment must be denied in large part. There remain material issues of fact as to the existence of Livonia's proffered legitimate interests and the relationship of those interests to the 1997 rezoning.

## III. SUMMARY JUDGMENT STANDARD

Courts properly grant summary judgment where the moving party establishes through pleadings, depositions, answers to interrogatories, admissions, and affidavits that "there is no genuine issue as to any material fact, and that the moving party is entitled to a judgment as a matter of law." *Mauro v. Borgess Medical Center*, 137 F.3d 398, 401 (1998), quoting FRCP 56(c). Under Rule 56(c), the movant bears an initial burden of demonstrating that an essential element of the nonmoving party's

case is lacking. *Kalamazoo River Study Group v. Rockwell Int'l Corp.*, 171 F.3d 1065, 1068 (6th Cir.1999) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). Once the moving party has met this burden, the nonmoving party must show the court that there is in fact a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party must identify specific facts, supported by evidence, and may not rely on mere allegations contained in the pleadings. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505.

In deciding a motion for summary judgment, the court must view the factual evidence in the light most favorable to the nonmoving party. *Mount Elliott Cemetery Ass'n. v. City of Troy*, 171 F.3d 398, 402–3 (6th Cir.1999) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). If there remains a dispute as to material facts such that a reasonable fact-finder could return a verdict for the non-movant, summary judgment is inappropriate. *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. 2505.

## IV. DISCUSSION

### A. COUNT II—SUBSTANTIVE DUE PROCESS VIOLATION

■ Both Michigan and federal courts recognize that zoning regulations may, in some circumstances, constitute violations of substantive due process. *See Schenck v. City of Hudson*, 114 F.3d 590, 593–4 (6th Cir.1997); *Frericks v. Highland*

*Township*, 228 Mich.App. 575, 579 N.W.2d 441 (1998) (citing *Kropf v. Sterling Heights*, 391 Mich. 139, 158, 215 N.W.2d 179 (1974)).[3] In order to prevail on a claim of a substantive due process violation, a plaintiff must demonstrate two things. First, as a prerequisite, the plaintiff must demonstrate the existence of a constitutionally-protected property interest. *See Silver v. Franklin Township Board of Zoning Appeals*, 966 F.2d 1031, 1036 (6th Cir.1992). Second, the plaintiff must demonstrate that the zoning ordinance is not rationally related to legitimate land use concerns. *See Gustafson v. City of Lake Angelus*, 76 F.3d 778, 790–1 (6th Cir.1996).

### 1. THE REQUISITE PROPERTY INTEREST

In order for Tandy to establish a constitutionally-protected property interest in the commercial zoning of the subject property, Tandy must demonstrate that it had a "legitimate claim of entitlement" or a "justifiable expectation" regarding the commercial zoning of the property. *See Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Silver*, 966 F.2d at 1036.

■ In *Nasierowski Bros. Investment Co. v. City of Sterling Heights*, 949 F.2d 890 (6th Cir.1991), the United States Court of Appeals for the Sixth Circuit (Sixth Circuit) considered facts similar to those in this case and found that the plaintiff had a recognizable property interest under Michigan law.[4] *Id.* at 897. Plaintiff Nasierowski Brothers Investment Co. (Nasierowski) sought to purchase an undeveloped parcel of real estate located in a sporadically developed industrial and commercial sector of the city in order to build a retail and

---

3. Although plaintiff's complaint is based on both the Michigan and federal constitutions, this opinion will discuss plaintiff's claims in light of federal constitutional analysis only. Michigan state court analysis of the constitutional claims is essentially identical to the federal analysis. *See, e.g. Bevan v. Brandon Township*, 438 Mich. 385, 389–391, 475 N.W.2d 37 (1991).

4. Constitutionally-protected property interests are, of course, not created by the Constitution itself, but by independent sources, such as, in this case, Michigan law. *Bishop v. Wood*, 426 U.S. 341, 344, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Board of Regents v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

warehouse facility on the property. *Id.* at 891. Nasierowski's acquisition of the property was made expressly contingent on its obtaining an opinion from the city stating that its proposed development was permitted as of right. *Id.* The city so informed Nasierowski, and it purchased the property. *Id.* After Nasierowski's purchase, however, it became apparent that at least one member of the city council was strongly opposed to the proposed use of the undeveloped land. While Nasierowski was in the process of obtaining site-plan approval and a variance as to certain requirements of the site plan, the issue of rezoning the property arose. *Id.* at 892. As part of a last-minute amendment to the proposed city-wide rezoning, the council approved an ordinance that changed Nasierowski's zoning classification from "general business" to "office development", effectively halting Nasierowski's efforts to develop the property. *Id.*

Among Nasierowski's several claims was a denial of due process claim. The defendant, like Livonia, argued that the plaintiff did not possess a property interest in the particular zoning of the property. The court of appeals disagreed:

> In the case at bar, Nasierowski actively pursued and completed a course of action of an inarguably substantial character in an effort to construct a retail and warehouse development on the property. ***First, and perhaps foremost, he expressly conditioned the purchase of the property on his obtaining a favorable zoning opinion from the City. It is clear that Nasierowski would not have purchased the land unless the City had first advised him that, as of right, he was authorized to develop the parcel along the proposed lines. The acquisition of the land was, in and of itself, a substantial act undertaken exclusively upon the City's approval and affirmative encouragement of the proposal.***
>
> Second, Nasierowski expended considerable money and effort in drafting a site plan, submitting it to the City for preliminary approval, petitioning the City for a variance from the specific site plan requirements, and negotiating with the City's planners and engineers in an effort to resolve minor disputes over relatively insignificant matters.
>
> . . . .
>
> Thus, Nasierowski had a property interest in the old zoning classification within which his development was permitted. That property interest was securely vested by Nasierowski's engagement in substantial acts taken in reliance, to his detriment, on representations from and affirmative actions by the City.

*Id.* at 897 (emphasis added).

In this case, Tandy purchased the subject property expressly contingent on Livonia's successful rezoning of the property from professional office use to commercial use—that is, on the successful resolution of the Wayne County action. During the course of the Wayne County action, Livonia Planning Director John Nagy submitted a seven-page affidavit defending and explaining the propriety of the City's decision to zone the property as commercial use. (Plaintiff's Appendix, Ex. 3). The commercial rezoning was eventually upheld by the court. Tandy then expended considerable time and money developing the site plans and obtaining the building permits and in fact had begun, unlike Nasierowski, grading the site of the Incredible Universe store before the project was canceled.

While the parties dispute the legal significance of these facts, the facts themselves are not in dispute, and summary judgment is therefore appropriate as to this issue. I find *Nasierowski* to be controlling; Tandy's property interest was "securely vested" by Tandy's actions taken in reliance upon Livonia's own affirmative actions.

In response, Livonia raises several counter-arguments. First, at oral argument, counsel for Livonia argued that *Nasierow-*

*ski* is inapposite because it involved a "procedural" due process claim rather than a "substantive" due process claim. Such a distinction is irrelevant for the present purpose. Whether the claimed violation is one of procedural or substantive due process, plaintiff must demonstrate the existence of a protected property interest; *Nasierowski's* teaching as to the existence of that property interest is applicable to either type of claim.

Second, defendant cites *Silver*, 966 F.2d at 1036, for the proposition that a property right cannot exist where the municipality retains discretion to deny the proposed use of the property. Livonia reasons that it retained inherent "discretion" to alter the zoning of the property through legislative action, so that Tandy could not have acquired a vested interest in the commercial zoning of the property. *Silver* is inapplicable for the present purpose. *Silver* involved "conditionally permitted use" zoning—a regulatory scheme in which the one type of development is "permitted" and second type of development is "conditionally permitted," contingent on obtaining the necessary clearance from the municipality. In the case of *Silver*, the property in question was zoned for single-family residential dwellings (the "permitted" use); with a permit, one could also build "low density planned unit developments", *i.e.*, condominiums (the "conditionally permitted" use). *Id.* at 1032. Critical to the disposition of that case, the court found that the municipality retained discretion to either issue the condition use permits or to refuse the same. *Id.* at 1036. The principle cited by Livonia, that there can be no property interest in a conditionally permitted use where the municipality retains discretion, is a principle tailored to the circumstances of that case, and is not applicable where, as here, Tandy was entitled, at the time it acquired the property, to develop the land commercially.

Third, citing *City of Lansing v. Dawley*, 247 Mich. 394, 225 N.W. 500 (1929), Livo-

nia contends that Tandy's actions were not sufficiently substantial to justify a finding that it had acquired a vested right in the commercial classification. That argument, however, is answered by *Nasierowski* itself. The Sixth Circuit expressly addressed the language and holding of *City of Lansing*, distinguishing the actions of the landowner in *City of Lansing*, who "went no farther than to order the plans and cause a survey to be made of the lot", *Nasierowski*, 949 F.2d at 897 (quoting *City of Lansing*, 247 Mich. at 397, 225 N.W. 500), from the actions of Nasierowski.

Finally, defendant, conceding for the sake of argument that Tandy did have a vested interest in the commercial classification of the property, contends that Tandy's property interest divested when Tandy did not complete the proposed Incredible Universe store:

> In the final analysis, Plaintiff's building permit, which was valid for only six (6) months, expired on April 11, 1996, and any vested right Plaintiff had in commercial zoning expired with it.

(Brief in Support of Defendant's Motion for Summary Judgment, p. 15). Defendant does not cite caselaw to support its theory of divestment, but rather relies on the apparent rationale that Tandy bought the property in order to build an Incredible Universe store and that, having failed to complete that project, Tandy has no further protected interest in the commercial zoning of the property. Defendant simply misconstrues the scope and basis of the property interest vested in plaintiff.

When Livonia defended the Wayne County action, it did not argue, understandably, that the commercial zoning was only appropriate in the event that the Incredible Universe store was built. Rather, Livonia spoke in general terms, of commercial land use: "Office and commercial land uses are regarded as harmonious land uses...." (Nagy Aff. ¶ 16, Plaintiff's Appendix, Ex. 3).[5] Importantly, when Tandy

---

**5.** Indeed, while the Nagy affidavit does re-

count some of the history of the initial rezon-

sought to purchase the property, it did not make the purchase contingent on the building of an Incredible Universe store, but generally, on commercial zoning of the land. Tandy's efforts in obtaining building permits for the Incredible Universe store and beginning the grading of the land, while certainly compelling evidence of its justifiable reliance, do not, in light of all the facts, define the limits of Tandy's interest in the commercial zoning.

## 2. RATIONALLY RELATED TO LEGITIMATE LAND USE CONCERNS

Having established that Tandy had a constitutionally-protected property interest in the commercial zoning of the subject property for the purposes of the substantive due process claim, the issue then becomes whether the 1997 rezoning from commercial use to professional office use is rationally related to legitimate land use concerns. See Gustafson, 76 F.3d at 790–1. Because this inquiry is sufficiently similar to the inquiry required in analyzing plaintiff's regulatory takings claim in part (B)(2) below, I defer discussion of this issue to part (B)(2).

## B. COUNT III—REGULATORY TAKINGS CLAIM

■ The courts have long recognized that "while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1014, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992) (quoting Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922)). As the United States Supreme Court noted in Lucas:

In 70–odd years of succeeding "regulatory takings" jurisprudence, we have generally eschewed any " 'set formula' " for determining how far is too far, preferring to "engag[e] in . . . essentially ad

hoc, factual inquiries." Penn Central Transportation Co. v. New York City, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978) (quoting Goldblatt v. Hempstead, 369 U.S. 590, 594, 82 S.Ct. 987, 990, 8 L.Ed.2d 130 (1962)).

Lucas, 505 U.S. at 1015, 112 S.Ct. 2886 (further citation omitted). A plaintiff may support a regulatory takings claim by demonstrating either (1) that the subject ordinance denies the owner all economically viable use of his land; or (2) that ordinance does not substantially advance legitimate state interests. See Agins v. City of Tiburon, 447 U.S. 255, 260, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980) (citations omitted).

## 1. ECONOMICALLY VIABLE USE OF THE LAND

■ There can be little doubt that the re-zoning of Tandy's plot of land from commercial to office use reduced the market value of the land—Tandy had been prepared to sell the property in the Sobel transaction for approximately $7.25 million; eventually, about two years later, the land was sold for $6.4 million. However, a taking does not occur simply because the owner is denied the highest and best use of the property. Goldblatt v. Town of Hempstead, 369 U.S. 590, 592, 82 S.Ct. 987, 8 L.Ed.2d 130, (1962). Courts have allowed substantial diminution in value without finding a taking. See, e.g., Euclid v. Ambler Realty Co., 272 U.S. 365, 47 S.Ct. 114, 71 L.Ed. 303 (1926) (no taking even though zoning ordinance reduced the value of land by 75 percent). Thus, the fact that Tandy did not realize the approximately $1 million profit that it might have does not *itself* establish a regulatory taking. To the contrary, the fact that the property was eventually sold for over $6 million to be developed under the office use classification compels the conclusion that the rezoning *did not* deprive Tandy of all economically viable use of the property.

ing, namely Victor Corporate Park's reconsideration of the Builder's Square store, see id., ¶ 5–6, to the extent that Nagy referred to any

specific uses of the Tandy property, he referred to restaurant uses.

This is not to say, however, that plaintiff's regulatory takings claim necessarily fails. Plaintiff may still establish a regulatory taking under the second theory noted above—by demonstrating that the rezoning of the property did not substantially advance legitimate state interests. *Agins*, 447 U.S. at 260, 100 S.Ct. 2138.

## 2. LEGITIMATE STATE INTERESTS/LAND USE CONCERNS AND A REASONABLE RELATIONSHIP TO THE 1997 REZONING

■ Thus, whether plaintiff's claim is analyzed as a takings claim or as a substantive due process claim, the central question of this case is the same: Is there a legitimate state interest advanced by Livonia's rezoning of the Tandy property, and is the rezoning of the property sufficiently related to that interest? [6]

### a. The Proffered Legitimate State Interests

■ The natural starting point of this central inquiry is to identify the proffered legitimate state interests that might be advanced by Livonia's rezoning of the Tandy property. Several such interests are suggested by the record and counsel's arguments: The Livonia City Planning Commission suggested, when it passed its resolution recommending rezoning of the

Tandy property in 1997, that the rezoning was supported by three state interests:

1) That the proposed change of zoning will provide for one uniform zoning district for the subject property.

2) That the proposed change of zoning will provide for uses which are compatible to and in harmony with the surrounding uses in the area.

3) That the proposed change of zoning will provide for the continuation of the development of the Victor Corporate Park.

(Plaintiff's Appendix, Ex. 12). At the July 16, 1997 City Council meeting, Councilman Feenstra suggested that rezoning advanced the City's interest in enhancing the property's value and promoting development, (Plaintiff's Appendix, Ex. 15, p. 6–7), and Councilman Taylor suggested that the rezoning was necessary to take advantage of improving office development and to restore the "dream" that a "12–story or 15–story office building" "was going to go there." (*Id.*, at 8). Finally, echoing the statements of Councilman Taylor, counsel for Livonia has asserted that the rezoning of the property advances Livonia's interest in restoring its Victor Corporate Park concept in light of an allegedly improving office market.

In the abstract, these are all legitimate land use concerns and state interests. The

---

**6.** While the central question of both the substantive due process claim and the regulatory takings claim is essentially the same, there is one notable difference: the nexus required between the legitimate state interest and the zoning decision differs markedly between the two claims. In a substantive due process claim, plaintiff must meet the heavy burden of demonstrating that there is no *rational* relationship between the proffered state interest and the zoning ordinance. In a regulatory takings claim, plaintiff's burden is somewhat lessened; there, plaintiff need demonstrate "only" that the zoning ordinance does not *substantially advance* the proffered state interest. *Nollan*, 483 U.S. at 834, 107 S.Ct. 3141. As Justice Scalia explained for the Court:

[O]ur opinions do not establish that [the standards applied to takings claims] are the

same as those applied to due process or equal protection claims. To the contrary, our verbal formulations in the takings field have generally been quite different. We have required that the regulation "substantially advance" the "legitimate state interest" sought to be achieved, *Agins v. Tiburon*, 447 U.S. 255, 260, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980), not that the State could rationally have decided that the measure adopted might achieve the State's objective. *Nollan*, 483 U.S. at 836 n. 3, 107 S.Ct. 3141 (internal quotation marks and citations omitted). In either case, however, courts have made clear that "a broad range of governmental purposes and regulations satisfies these requirements." *Nollan*, 483 U.S. at 834–5, 107 S.Ct. 3141.

issue then is whether or not there is a sufficient nexus between these interests and the 1997 rezoning.

### b. The Relationship between the State Interests and this Rezoning

Several of the reasons given by Livonia in support of the rezoning are neither rationally related (substantive due process) nor substantially related (regulatory takings) to the rezoning decision. I begin with the three reasons advanced by the City Planning Commission.

 Reason (1) suggests that Livonia had a legitimate interest in uniform zoning of the entire Tandy property. Prior to the 1997 rezoning, the Tandy property was intersected by two zoning districts. In the very north, adjacent to the Embassy Suites Hotel, it was zoned C–4III—high-rise commercial (as was the Embassy Suites Hotel). The remainder of the property was zoned C–2 (general commercial). Parenthetically, it appears that prior to the 1995 rezoning, the property was also subject to two zoning classifications—C–4III at the very north with PO–III (professional office-use) covering the remainder of the property. Assuming that Livonia has some interest in having just one zoning classification for this entire plot of land, this proffered interest nonetheless fails to explain why a plot of land zoned for commercial and high-rise commercial use ought to be rezoned to professional office use.

 Reason (2) suggests that Livonia has an interest in assuring that the land use to which the Tandy property is put is compatible and harmonious with surrounding land uses—a suggestion that is undoubtedly true but again, does not explain *this* rezoning decision. Office use is compatible with the surrounding land uses (restaurants, a hotel), but it is undisputed that further commercial development is also compatible with the existing uses. Indeed, in Nagy's affidavit to the Wayne County Circuit Court, he specifically asserted that "[o]ffice and commercial land uses are regarded as harmonious land uses...." (Nagy Aff. ¶ 16, Plaintiff's Appendix, Ex. 3).

Reason (3) suggests that Livonia had a legitimate interest in the continued development of Victor Corporate Park. It is undisputed, however, that the Tandy property was capable of being developed either as commercial property or as office property. Indeed, given the fact that Tandy would have been able to sell the property in early 1997 for $7.25 million but for the rezoning, and was delayed for more than two years by the rezoning of the property—finally selling the land in 1999 for $6.4 million—the rezoning seems to have hindered, rather than helped development of the land.[7]

Based on the same facts, Councilman Feenstra's suggestion that the rezoning was necessary to increase the property's marketability also fails. It is undisputed that this property was, and probably is, more marketable as commercial property than as office use property.

 Finally, then, I turn to the reason for the rezoning suggested by Councilman Taylor and most strongly advanced by counsel—the reason which forms the crux of this case: that the rezoning was rationally and substantially related to Livonia's interest in restoring the Victor Park concept in light of the allegedly improving office market.

As noted, Livonia first considered Victor Corporate Park's proposal to change what would eventually be the Tandy property from professional office use to commercial use in 1993. That proposal was made in light of an alleged downturn in the office market. (Brief in Support of Defendant's Response to Plaintiff's Motion for Partial

---

**7.** To be fair, it may be that this reason was meant to suggest that rezoning of the property would promote development of the Tandy property not generally, but as part of the corporate park concept. That issue is addressed below.

Summary Judgment, Ex. A). The record reveals some reluctance on the part of Livonia to approve the requested rezoning, doing so only after several months of inquiry and after Victor Corporate Park had removed the Builder's Square proposal for the site.

When the City's action was challenged in the state court action in 1995, the City defended its decision, not simply by citing declining office market, (*see* Plaintiff's Appendix, Ex. 3 (noting that the property "is being rezoned ... because development for office purposes was not deemed to be economically feasible")), but also by citing a myriad of factors that suggested that commercial zoning of the Tandy property was appropriate. (Plaintiff's Appendix, Ex. 3; Ex. 4, p. 4). The City stated that the Tandy property was surrounded in part by commercial zoning, that commercial zoning was harmonious with office uses, and that the decision to grant commercial zoning "was part of larger pattern of commercial rezoning along the I–275 corridor." (Id., Ex. 4, p. 4). Planning Director Nagy also noted that recent residential growth supported the rezoning of the property to the C–2 commercial classification. (Id., Ex. 3, ¶ 23). In short, Livonia adopted the position that commercial zoning of the property was consistent with the development of the Victor Park concept. *"In the judgment of the Planning Department, it was not necessary for the subject property to remain zoned exclusively for office uses in order to advance the goals of the master plan or assure its*

*stability."* (Id., Ex. 3, ¶ 25 (emphasis added)).[8]

In 1997, the City's position changed. It now asserts that office use development of the Tandy property does substantially advance (and/or is rationally related to) its interest in the development of the Victor Corporate Park and professional office development in Livonia.

In response to the apparently conflicting positions taken before the state court and before me, the City contends that its change in position, and its rezoning decision, is supported by an improvement in the office market in the time between 1995 and 1997. The parties dispute, however, whether such an improvement in fact occurred. Livonia contends that the improvement did occur, citing an excerpt of an article from the "The Friedman Report, Greater Detroit Office Market, January 1997". (*See* Answer, Ex. C).[9] Defendant also cites the comments of Councilman Taylor at the July 16, 1997 meeting, in which he noted that several office construction projects were occurring in the Victor Corporate Park. (Plaintiff's Appendix, Ex. 15, p. 8). In response, plaintiff notes that the new construction to which Councilman Taylor referred was already contemplated by the Council and does not represent a change in circumstances from what the Council anticipated in 1995. It is also worth noting that the Friedman Report upon which Livonia relies, while it does state that the office market was improving, suggests that the 1995 occupancy

---

8. Victor Corporate Park, co-defendant with Livonia in the 1995 state court action, would eventually represent to the Wayne County Circuit Court that there was as much as 1,000,-000 square feet of undeveloped office space still remaining in the park, (Brief in Support of Defendant's Response to Plaintiff's Motion for Partial Summary Judgment, Ex. G, p. 8), supporting the position that office use development of this particular parcel of land was not necessary to the continued development of Victor Corporate Park.

9. It might be noted that this report exemplifies the troubling haste with which the City

acted to rezone the Tandy property from commercial use to professional-office use. The City Council hearing on the proposal was held on July 16, 1997, and the resolution to send the rezoning proposal to the Law Department for an ordinance was passed on July 21, 1997. *After the proposal had already been sent to the Law Department,* on August 5, 1997, Livonia's Council received the report establishing a modest 3% increase in the office market.

Contrast these actions with the nearly year-long debate and consideration afforded to the 1994 rezoning.

rate was in fact already at 93%. These facts suggest that summary judgment is inappropriate—there remains a triable issue of fact as to whether an improving office market did exist to explain the city's changed position.[10]

Furthermore, whether there was an improving office market is not the only factual issue remaining in the case. The Supreme Court has held, as recently as last term, that the determination whether a land use decision substantially advances legitimate state interests is "essentially fact-bound in nature." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 119 S.Ct. 1624, 1644, 143 L.Ed.2d 882 (1999). Here, Livonia once took the position that office use development of the Tandy property was not necessary to the corporate office development of Livonia; it now asserts that it is. It was once noted that as much as 1,000,000 square feet of potential office space was available in the Victor Corporate Park; Livonia now asserts that that is no longer the case. Whether or not that is true, the fact that a very substantial amount of office space is or may be available casts doubt on Livonia's assertion that office use development of *this* particular property is rationally or substantially related to its interest in office development and the Victor Park concept. This issue is properly submitted to the trier of fact. *Id.*

Finally, it bears repeating that this case "necessarily requires a weighing of private and public interests." *Agins*, 447 U.S. at 261, 100 S.Ct. 2138. That necessary balance cannot be determined without a factual inquiry as to the relationship between Livonia's interests in the Victor Park concept, the allegedly fluctuating office market, and the rezoning of this particular property.

For these reasons, I find that summary judgment is not appropriate as to the alleged existence of the changing office mar-

ket, as to its impact on the propriety of the 1997 rezoning, and as to the relationship between Livonia's interests in the Victor Corporate Park concept and the 1997 rezoning.

## V. CONCLUSION

I find, as a matter of law, that Tandy possessed the "property interest" in the commercial zoning of the subject property necessary to sustain a substantive due process claim. I also find that as to several of the proffered legitimate state interests, specifically the three reasons cited by the City Planning Commission and the one reason cited by Councilman Feenstra, the undisputed facts compel the conclusion that the 1997 rezoning either did not substantially advance the proffered ends, or were not rationally related to them. As to the remainder of the issues, however, a trial is necessary to resolve disputes of material fact.

Plaintiff's motion for partial summary judgment is granted in part. Defendant's motion for summary judgment is denied.

**IT IS SO ORDERED.**

---

**10.** Curiously, despite this factual dispute, ***both*** parties contend that summary judgment is appropriate. Upon explicit questioning during a hearing on this matter, counsel for both sides expressed the opinion that I did not need to proceed to trial in order to resolve this case.