Otis WILSON, et al., Plaintiffs,

v.

DANA CORPORATION, Defendant.

Civil Action No. 3:00CV–72–H.

United States District Court,
W.D. Kentucky,
At Louisville.

July 3, 2002.

Thomas E. Clay, Louisville, KY, for plaintiffs.

Philip C. Eschels, Greenebaum Doll & McDonald, Louisville, KY, John R. Maley, Barnes & Thornburg, Indianapolis, IN, Kathleen M. Anderson, Dawn R. Rosemond, Barnes & Thornburg, Fort Wayne, IN, for defendant.

## MEMORANDUM OPINION

HEYBURN, Chief Judge.

Plaintiffs have filed suit alleging that Defendant discriminated against them because of their race, in violation of Kentucky's Civil Rights Act, K.R.S. § 344.010 *et seq.* Defendant Dana Corporation operates a manufacturing facility in Elizabethtown, Kentucky, that produces truck frames for Ford Motor Company. Plaintiffs are six African American current or former employees at Dana's Elizabethtown plant. Dana has moved for summary judgment on all of Plaintiffs' claims.

Plaintiffs' complaint and amended complaint are, unfortunately, rather imprecise. To judge them fairly, the Court attempts to state precisely the claims of each individual Plaintiff and what actual facts may support those claims. This was not an easy process. As part of this effort, the Court held a conference to informally discuss many of its tentative conclusions and give counsel an opportunity to respond. One unavoidable consequence of this thorough process is an unusually lengthy opin-

ion. Only in retrospect does such detail seem overdone, as these claims fall well beneath the required standards.

## I.

All six Plaintiffs allege that they were "subject[ ] to conduct of a discriminatory nature on the basis of [their] race." Pls.' Compl. at ¶¶ 12, 14, 16, 18, 20, 22. Three Plaintiffs—Zanetta Johnson, Alma Kyle, and Mike Robinson—provide no further explication of the specific nature of their discrimination claim. Of the remaining three, Otis Wilson additionally alleges that he was wrongfully terminated, Harry White alleges that he was constructively discharged, and Kenneth Thomas alleges that he was retaliated against in violation of both Kentucky's Civil Rights Act and the federal Family Medical Leave Act ("FMLA").

In its summary judgment motion, Dana categorized Plaintiffs' claims (in addition to Thomas' individual retaliation/FMLA claim) as having been brought under two broad causes of action: hostile work environment and racial discrimination. Plaintiffs have made no effort to challenge these characterizations. Instead, in their reply brief they offer arguments limited solely to establishing disputed material issues of fact as to their hostile work environment claims. Accordingly, the Court must assume that Dana's classification of Plaintiffs' substantive causes of action is accurate, and will decide under this framework whether Plaintiffs' claims may proceed to trial.

## A.

"In deciding a motion for summary judgment, the court must view the factual evidence in the light most favorable to the nonmoving party." *Harris v. General Mo-*

*tors Corp.,* 201 F.3d 800, 802 (6th Cir.2000) (citing *Mount Elliott Cemetery Ass'n v. City of Troy,* 171 F.3d 398, 402–03 (6th Cir.1999)). For the purposes of deciding this motion only, the Court will assume that all facts alleged by Plaintiffs are true. Evaluating these facts is no simple task, however. Not all evidence offered by a plaintiff is relevant or admissible, an axiom that is particular salient in the instant case.

▮▮▮ Each of the six Plaintiffs has alleged multiple incidents of racial discrimination, and collectively they have presented to the Court a voluminous and complex factual record. Dana has filed a motion to strike portions of Plaintiffs' reply brief on the grounds that many of the "facts" asserted therein constitute inadmissible hearsay, are misrepresentations of deposition testimony, or are otherwise unsupported by the record. Dana's challenge to Plaintiffs' methods is justified. For example, in opposing Dana's motion to strike, Plaintiffs argue that "Dana also contends that a portion of Plaintiffs' counterstatement of material facts constitutes inadmissible hearsay. At summary judgment stage, however, it is not necessary for the non-movant to provide evidence in support of its claim in admissible form." Pls.' Mot. Opposing Dana's Mot. to Strike Portions of Pls.' Counterstatement of Facts at 3. This second sentence undoubtedly is correct. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The first statement, however, is simply an implied misstatement of the law. "Hearsay evidence may not be considered on [a motion for] summary judgment." *Jacklyn v. Schering–Plough Healthcare Prods. Sales Corp.,* 176 F.3d 921, 927 (6th Cir. 1999) (citing *Wiley v. United States,* 20 F.3d 222, 226 (6th Cir.1994)).[1]

---

**1.** The Court notes that Plaintiffs have made no effort, despite ample opportunity to do so, to demonstrate whether any of the statements

challenged by Dana as hearsay are admissible as nonhearsay or under an exception to the hearsay rule.

Nevertheless, the Court will deny Dana's motion to strike, instead opting to closely scrutinize each of Plaintiffs' allegations separately. Hearsay, as well as allegations that are not accurate representations of deposition testimony, will not be considered by the Court. As have both parties, the Court will set forth the facts in the context of each individual Plaintiff.

### 1.

Otis Wilson was employed by Dana from January 1996 to October 1998. He alleges specific incidents of racial harassment, claims that Dana's supervisors treated black employees differently, and more harshly, than their white counterparts, and asserts that he was wrongfully terminated.

First, in 1996, a co-worker called Wilson "fucking lazy," in the presence of a supervisor, who did not react. Wilson attributes both the remark and the supervisor's indifference to racial animus. In mid 1996 and early 1998, two different black co-workers told Wilson that they had been called "nigger."[2] In early 1998, a black co-worker told Wilson that a white co-worker had referred to the efforts of maintenance men to fix a piece of machinery as having "nigger-rigged" the hoist.

Second, in July 1998, a supervisor reprimanded Wilson and other black co-workers for failing to follow instructions to clean, but did not similarly reprimand white co-workers who also were not cleaning. He complained to his area manager, who told Wilson that the supervisor was "young" and without much "tact." In 1998, when Wilson was accused of sexual harassment, he was not informed of the identity of his accuser, whereas similarly accused whites were provided this information. Wilson also briefly alleges a litany of examples in which Dana treated other black employees differently from their white counterparts in the contexts of disciplinary, leave, and work assignment policies.[3]

Finally, Wilson was terminated on October 19, 1998, ostensibly for violating Dana's leave of absence policy. Wilson alleges that Dana did not allow him to use "occurrence erasers" that he had accumulated to expunge his unexcused absences, although white employees with worse records were permitted to do so.

### 2.

Alma Kyle was employed by Dana from October 1996 to December 2000. She alleges a number of incidents of racial hostility.

In November 1998, a white co-worker once told her that he referred to a black male co-worker as "Buckwheat." She complained to her line manager, who excused the speaker's conduct because he was "young," and had been raised according to "different values." This same line manager told her that "[b]ack in the days, my father kept this black man," and "we called him Nigger Charlie."

---

**2.** Plaintiffs' brief states that "Wilson heard a black co-worker being called 'nigger' on three different occasions." Pls.' Br. in Opposition to Def. Dana Corp.'s Mot. for Summ. J. ("Pls.' Br.") at 1. This statement grossly mischaracterizes Wilson's deposition testimony, in which he explicitly stated that he personally never heard any racist slurs. *See* Wilson Dep. at 505–06. Furthermore, of the three different occasions referred to, one incident occurred in November 1999, after Wilson was fired (the Tim Slinker incident), and Wilson had no recollection of any details about another. *See id.* at 248. These two allegations

are therefore irrelevant and inadmissible for the purposes of this motion. The third allegation, the Chris Terry incident, occurred during Wilson's tenure at Dana, *see id.* at 251, and is one of the two incidents considered by the Court in the text of this opinion. The other is the Steve Best incident, referred to by Plaintiffs later in their brief, which Wilson did not witness, but was informed of while still employed at Dana. *See id.* at 326–27.

**3.** These multiple allegations are all stated within a single cursory paragraph. *See* Pls.' Br. at 2.

Also in November 1998, Kyle saw posted in the plant a United Way fundraising picture featuring two male Dana employees in drag, and was offended because she felt they resembled "Aunt Jemima." She complained to a supervisor, who had the picture removed that same night.

On a date not indicated in the record, Kyle witnessed a white co-worker pulling another white co-worker with a rope, and she believed that they were imitating a current news story about a black man in Texas being dragged to death while tied to a pickup truck.

In December 1998, Kyle saw a white male co-worker toss a ball of black wax to a white female co-worker, and say, "[y]ou will look like this. You will look like a nigger berry." She complained to a supervisor, who investigated the incident. The co-worker who allegedly uttered the slur insisted that he used the word "dingleberry." Dana nonetheless cautioned him about his behavior, and asked Kyle if she wanted to press charges against him. She declined.

In 1996, she overheard a white co-worker say to a black co-worker, "[t]hat's the reason why you are—you are as black as you are."

Finally, in August 1999, while receiving therapy at a Dana facility for a work-related injury, she asked about the function of a hook on a nearby machine. Her therapist, a white male, stated "that's what we hang people with," and another therapist, a white female, stated "[t]hat's what we're going to hang you with, Alma." She reported the incident to Dana supervisors, who investigated and told the therapists to avoid making such statements.

3.

Kenneth Thomas was employed by Dana from 1995 to 2001. He alleges that Dana fostered a racially harassing environment, that blacks were treated differently from whites in terms of discipline and advancement, and that he was fired in retaliation for filing this lawsuit.

First, in an undated incident, a white co-worker told him "basically to get my black ass down" from a piece of equipment. Thomas complained to his supervisor, who "stated that he's tired of this goddam shit." On another undated occasion, a different white co-worker told Thomas to "get my black ass over to him because he wanted to talk to me." Thomas alleges that he was informed twice that black co-workers had been called "nigger."[4] In winter 1997, two black co-workers told Thomas that they had witnessed a noose hanging in front of the cafeteria. When Thomas' co-workers complained, their coordinator told them to go ahead and remove it themselves. Thomas never saw the object nor did he file a complaint. In 1998, Thomas was informed by a co-worker that certain white co-workers were discussing possible ways to terminate or compel the resignation of Thomas, as well as one black and one white co-worker with whom he was associated.

Second, as to differential treatment, a white supervisor once accused Thomas and three black co-workers, before a meeting of approximately fifty employees, of damaging part of Dana's facilities, and threatening to fire all four if they did not confess. Often, Thomas was given menial tasks to perform, such as cleaning, and white co-workers were not. A supervisor once wrote Thomas up (along with another white male co-worker) for failing to follow

**4.** These are the same 1996 and 1998 incidents cited by Wilson, and Thomas also did not personally witness the incidents.

instructions, even though the instructions had not been communicated to him. Also, Thomas was required to take a urinalysis test following a forklift accident. The test revealed that Thomas had been taking prescription drugs for a work-related injury. But, Thomas had not informed his supervisors that he was doing so, a violation of company rules, for which he was written up and suspended. Thomas contends that a white co-worker who had an accident at work was not drug-tested, although Thomas concedes that the circumstances in this incident were different; most significantly, the worker was not driving a forklift at the time of his accident, as Thomas had been.[5]

Thomas also alleges that Dana engaged in a number of tactics to deny him promotions, such as discouraging him from applying for positions, lowering the minimum qualifications for white applicants, and promoting white employees with less experience.

Finally, Thomas suffered a nervous breakdown in March 2001, and, at his request, Dana placed him on medical leave of absence from March 13 to March 21 of that year. Thomas did not return to work on March 22 as expected, and did not contact Dana to explain his absence or request a leave extension. Pursuant to company policy, Dana terminated his employment on March 23, 2001.

### 4.

Zanetta Johnson was employed by Dana from 1996 to 2001. She alleges Dana discriminated against her by preventing her from advancing within the company, failing to address racial harassment, and treating black employees worse than white employees.

First, she was repeatedly denied promotions in favor of white applicants after Dana engaged in tactics contrary to company policy, such as: hiring temporary workers instead of promoting from within, declining to interview her after she had submitted an application, improperly discounting her experience or interest in certain positions, and altering her test scores.

Second, Johnson's co-workers saw a noose hanging from the flagpole in front of Dana's building. Two of her co-workers removed the noose and complained to management, but Johnson herself neither saw the object nor filed the complaint. Also, in 1998, a maintenance employee once said to her that he was "sweating like a nigger."

Finally, at some point Johnson was moved to a position at a press that involved lifting side rails, which hurt her back. She requested a transfer to a different press that had raisers, which would impose less back strain. Dana denied her request, despite having similarly accommodated a white co-worker.[6]

### 5.

Harry White was employed by Dana from January 1996 to July 1999. He alleges that he and black co-workers were harassed, disciplined, assigned work, and denied promotions in ways that white co-workers were not. White also claims that he was constructively discharged.

---

**5.** Thomas does not offer, nor could the Court locate, dates for any of the incidents listed in this paragraph.

**6.** Plaintiffs' brief also states that "Johnson was denied military leave when she was selected for warrant officer school, training which required Johnson's absence from her work for 30 days." Pls.' Br. at 9. This state-

ment is inaccurate. Johnson testified that some of her supervisors balked when she initially submitted her leave request—which allegedly was never a problem for white co-workers—but she also stated that after informing Dana of her rights as a military reservist, her request was approved, without her forfeiting any salary or personal leave. *See* Johnson Dep. at 132–38.

First, in 1998, White complained to a supervisor when he interpreted comments the supervisor had made during a meeting to imply that incidents of vandalism and stealing around the plant were attributable to blacks. The supervisor explicitly denied that this was the substance or intent of his remarks, and said, "[y]ou people seem to get pissed off about a lot of stuff, don't you, Harry?" In late 1997 and early 1998, White heard a black co-worker called "nigger." On an unspecified date, White saw a noose that his co-workers had found and removed from the cafeteria door. At different times in 1998, White saw racist graffiti in the restrooms that said, for example, "niggers get out," "we don't like black people," and "black blow jobs, call . . .". He complained each time he saw the graffiti, and each time it was removed within a week of the complaint. Also, white co-workers harassed black co-workers by interfering with their ability to perform their jobs. For example, in one instance, white co-workers placed chewing gum in the weld path of a black co-worker's welding gum, causing negative results.

Second, as to discipline, in May 1998, White was solely reprimanded for not exercising during a morning meeting, even though his white co-workers were not exercising either. He complained, and the supervisor who chastised White apologized to his (the supervisor's) boss, but did not apologize to White. In December 1997, White was written up for leaving his work station, but a white co-worker who had left with him was not disciplined. Regarding work assignments, White states that he and other black employees were continually ordered to clean while supervisors ignored groups of white employees standing around and talking. He complained, and his supervisor told him to be patient with Dana's "young management team." On another occasion, after he'd complained again, White states that a black coordinator told him, "[y]ou know how they do us

brothers." The coordinator denies both that he received a complaint from White and that he made such a comment in response. Also, after White was injured, he was automatically assigned light duty work only after specifically requesting the transfer, whereas injured whites were automatically moved, and once there he was given more strenuous light duty work than were whites.

Finally, White was prohibited from advancing into certain positions on spurious grounds, such as being told he could not pass the requisite tests for certain positions, and being falsely informed that a college degree was necessary. Dana deemed White a "voluntary quit" on July 1, 1999, pursuant to company attendance policy, after White did not report to work or call in on June 28, 29, and 30. White concedes that he understood his actions would result in his termination, but left because he could no longer take the harassment.

6.

Michael Robinson is currently employed by Dana, and has worked there since 1996. He alleges discrimination by Dana in three respects.

First, within six months of joining Dana, he began working in the hot wax department at a station that was staffed by at least two persons. After Robinson's initial co-worker was transferred, an additional employee was sometimes assigned to the post, but not always. Robinson repeatedly complained that the position required more than one person, but often to no avail. Robinson alleges this treatment was racially discriminatory in that none of his white co-workers ever had to staff a hot wax position alone.

Second, in 1997 or 1998, Robinson was denied the opportunity to travel to a Ford plant in Michigan and serve as a temporary product technician there (i.e., a visit-

ing troubleshooter). Robinson had traveled to Michigan in this capacity on a couple of occasions before Ford insisted that all visiting technicians be members of Dana management. This requirement disqualified Robinson, but Dana continued to send one of Robinson's white co-workers who was not management, although Ford mistakenly believed that he was. In other words, according to Robinson, Dana provided a white co-worker with an advancement opportunity that was denied to Robinson.

Third, in 1998, Robinson saw a United Way fundraising poster that he believed resembled Aunt Jemima, and was offended.

## II.

Dana has moved for summary judgment on all of Plaintiffs' claims, and offered comprehensive arguments why the Court should rule in its favor on each claim and as to each party. Plaintiffs, however, in their reply brief defended only their hostile work environment claims. Thus, while Plaintiffs have not explicitly abandoned their non-hostile work environment claims, they have left Dana's arguments on these issues essentially unchallenged. The Court will address Plaintiffs' contested hostile work environment claims first, and lastly examine Plaintiffs' remaining racial discrimination claims.

## A.

■ The Court uses federal Title VII standards to evaluate state race discrimination claims brought under Kentucky's Civil Rights Act. *See Smith v. Leggett Wire Co.*, 220 F.3d 752, 758 (6th Cir.2000); *Stewart v. Univ. of Louisville*, 65 S.W.3d 536, 539 (Ky.Ct.App.2001). Title VII recognizes hostile work environment claims based on racial harassment. *See Smith*, 220 F.3d at 760; *Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir.1999).

■ "In order to establish a racially hostile work environment under Title VII, the plaintiff must show that the conduct in question was severe or pervasive enough to create an environment that a reasonable person would find hostile or abusive, and that the victim subjectively regarded it as abusive." *Smith*, 220 F.3d at 760. In addition to satisfying both the objective and subjective elements of this standard, "[t]he plaintiff must also prove that his employer 'tolerated or condoned the situation,' or knew or should have known of the alleged conduct and did nothing to correct the situation." *Id.* (quoting *Jackson*, 191 F.3d at 659).

■ Courts must "determine whether an environment is sufficiently hostile or abusive by 'looking at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). The Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment." *Id.* at 788, 118 S.Ct. 2275. In other words, the harassment must have "adversely affected the employee's ability to do his or her job." *Moore v. KUKA Welding Sys.*, 171 F.3d 1073, 1079 (6th Cir.1999).

■ The Sixth Circuit has emphasized a number of important principles, each particularly relevant to the present case, that delineate the boundaries of a plaintiff's required evidentiary showing. First, the court must not disaggregate episodic harassment into discrete and isolated incidents. "[T]he issue is not whether each

incident of harassment standing alone is sufficient to sustain the cause of action in a hostile environment case, but whether—taken together—the reported incidents make out such a case." *Jackson,* 191 F.3d at 659 (quoting *Williams v. General Motors Corp.,* 187 F.3d 553, 562 (6th Cir. 1999)).

 Second, "racial epithets need not be hurled at the plaintiff in order to contribute to a work environment that was hostile to her." *Id.* at 661. But, whether a plaintiff was the intended target of the offending conduct informs the analysis of whether the harassment suffered was severe and pervasive. *Cf. Black v. Zaring Homes, Inc.,* 104 F.3d 822, 826 (6th Cir.1997) ("While we emphasize that sex-based comments need not be directed at a plaintiff in order to constitute conduct violating Title VII, we note that in this case most of the comments were not directed at plaintiff; this fact contributes to our conclusion that the conduct here was not severe enough to create an objectively hostile environment.").

 Finally, courts may "credit[ ] evidence of racial harassment directed at someone other than the plaintiff when the plaintiff knew a derogatory term had been used." *Jackson,* 191 F.3d at 661. But, the fact that the challenged conduct must be examined on both an objective and subjective basis also requires that the plaintiff must at least have been aware of the harassment while employed by the defendant. *Cf. Wanchik v. Great Lakes Health Plan, Inc.,* 2001 WL 223742, at *8 (6th Cir. Mar.2, 2001) (noting that, in a gender-based hostile work environment claim, the "plaintiff must have been aware of these incidents [of harassment] during her employment, even if indirectly, for the accounts of others to be relevant").

## B.

 At the outset, the Court notes the inherent difficulty in determining the quantum of execrable behavior necessary to implicate Title VII. "There is no bright line between harassment and merely rude or obnoxious behavior...." *Moore,* 171 F.3d at 1079. *Cf. also Harris,* 510 U.S. at 22, 114 S.Ct. 367 ("This is not, and by its nature cannot be, a mathematically precise test."). In developing the standards for examining allegedly hostile work environments, both the Supreme Court and the Sixth Circuit have established that the challenged harassment must be "severe," "pervasive," and "extreme." By utilizing such exacting terms, these courts have imposed upon plaintiffs a heightened evidentiary burden, but necessarily so. As Justice Souter explained in the context of gender-based harassment, "[a] recurring point in these opinions is that 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher,* 524 U.S. at 788, 118 S.Ct. 2275 (internal citation omitted). Thus, the "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.' Properly applied, they will filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing.'" *Id.* (internal citations omitted).

As the Court will now discuss, Plaintiffs' claims fall within the latter category of unfortunate, but sporadic, harassment that evinces a work environment that may be offensive, but not so hostile as to impose liability upon an employer under federal law.

### 1.

■ Otis Wilson worked at Dana for almost three years. During that time he learned of two or three instances of racial hostility. A white co-worker's insult to Wilson that he was "fucking lazy" was not obviously racist. Wilson asserts only his belief that the remark was racially motivated. In 1996 and 1998, Wilson learned that two different black co-workers had been called "nigger," and in 1998, Wilson learned that a white co-worker had made a racist reference ("nigger-rigged the hoist"). While an employee need not personally witness nor be the target of racist comments for a work environment to be hostile enough to violate Title VII, both the objective and subjective elements of the standard must be satisfied. Two or three racist comments over the course of almost three years, none of which were directed at Wilson, does not come close to constituting severe or pervasive harassment, even if he regarded it as abusive.

Furthermore, Wilson has not shown that the alleged conduct was so extreme that it amounted to a change in the terms and conditions of his employment. He alleges that blacks were ordered to clean while whites were not, but he also does not deny that cleaning was part of his job responsibilities. Dana has introduced evidence that white employees were also made to clean while the line was down.[7] Finally, Wilson's allegation of racist treatment fol-lowing his sexual harassment charge is unsubstantiated, and his list of allegations involving disciplinary, leave, and work assignment policies is presented in far too little detail for the Court to evaluate the nature and frequency of the challenged conduct.

### 2.

■ Alma Kyle presents a somewhat stronger hostile work environment claim. She alleges six incidents of racial harassment over the four years and four months of her employment at Dana. Three of these incidents involved Kyle's subjective interpretation of racial animus: the "Aunt Jemima" poster; seeing a white co-worker pulling another white co-worker with a rope; and her therapists' comments that a hook on a machine would be used to hang Kyle. None of these involved racial threats or degrading remarks or gestures toward Kyle, or featured conduct that was legitimately physically threatening.[8] The other three incidents had more racist connotations: the "Buckwheat," "nigger berry," and "that's the reason you are as black as you are" remarks. However, each incident was an isolated event, was subject to a benign interpretation, and the remarks were neither directed at her nor threatening. Even assuming all six events had some racially motivated factor, Kyle does not adequately demonstrate that this conduct was severe and pervasive.

---

7. This allegation exemplifies a persistent difficulty in this case. Where Wilson and other Plaintiffs say that they were made to "clean," the Court can consider this as evidence. After all, this is their firsthand knowledge. However, it is difficult, if not impossible, to consider the charge that white employees were not also required to clean. Plaintiffs' mere assertion of such a conclusion amounts to little more than their own evaluation, judgment or allegation, without any supporting evidence. The case hinging on allegations of disparate treatment cannot go to the jury on mere allegations alone.

8. Regarding her therapists' comments that they would use a hook on a nearby machine to hang her, Kyle's deposition testimony indicates that she never actually feared for her safety. According to Kyle, both therapists were laughing and joking while making the comments, and there was no rope attached to the hook. See Kyle Dep. at 142–43, 149. Furthermore, Dana's counsel asked Kyle, "what was offensive to you about their statement concerning the hook?", and Kyle replied, "I don't know." Id. at 149.

In addition, Kyle does not present sufficient evidence that Dana tolerated or condoned the harassment. She complained about her co-workers' conduct four separate times. On one occasion, her line manager allegedly was dismissive of her concerns, and even uttered the offensive "Nigger Charlie" remark. However, on the other three occasions, Dana swiftly undertook remedial action, removing the "Aunt Jemima" poster, and warning accused white employees that racist conduct would not be tolerated.

In all these ways, Kyle's circumstances are markedly less actionable than other cases where courts have found a viable hostile work environment claim. Looking at the totality of the circumstances, Kyle has not proven that her work environment was objectively and subjectively abusive, and that Dana did not act to remedy the situation.

### 3.

 Kenneth Thomas worked at Dana for approximately six years. During that time he was twice personally subject to racist slurs. One white co-worker told Thomas to get his "black ass" down from a piece of equipment. Another white co-worker told Thomas to get his "black ass" over to speak with him. Thomas additionally alleges four incidents that he learned of from others. Black co-workers were twice called "nigger," and once they found a noose hanging in front of the cafeteria. Finally, Thomas was informed that certain white co-workers were scheming to get rid of him, along with other black and white co-workers. While offensive, the alleged harassment was too sporadic and attenuated to be deemed so severe or pervasive that a reasonable person would find Thomas' work environment to be hostile or abusive.

Nor does Thomas demonstrate that the alleged harassment was so extreme that it amounted to a change in the terms of his employment. Significantly, Thomas does not dispute that after the date he learned of the alleged plot by his co-workers to compel his resignation or termination, Dana offered to promote him to a coordinator position, which he rejected. Thomas states he had other reasons for not accepting the advancement. That may be so, but the fact that Dana sought to promote him indicates that the alleged harassment did not unreasonably interfere with Thomas' work performance.

The same is true for Thomas' claims involving differential treatment. Even if a supervisor falsely accused Thomas and his black colleagues of damaging Dana's facilities, there is no evidence that any adverse consequences resulted from the accusation. Thomas' other complaints about inequitable discipline do not even indicate racial hostility. The time he was written up for failing to follow instructions, a white co-worker was disciplined for the same offense. The urinalysis test administered to Thomas following his forklift accident was required by standard company procedure, and Thomas does not deny that his failure to inform his supervisors that he was taking prescription drugs while operating heavy machinery was a violation of company rules. Thomas further concedes that he did not lose any salary or benefits for any of these disciplinary measures, and that the white co-worker he compares himself to was not similarly situated. Finally, like Wilson, Thomas acknowledges that cleaning was part of his job responsibilities, and he has no evidence that blacks were forced to perform menial tasks more often than whites.

### 4.

 Zanetta Johnson's hostile work environment claim is comparatively weak. She fails to explain how her multiple allegations involving Dana's failure to promote her constituted severe and pervasive abu-

sive conduct; these are more appropriately considered as part of her racial discrimination claim. Otherwise, Johnson alleges three specific incidents of harassment over the course of her six-year employment at Dana: her co-workers seeing a noose, a maintenance worker saying to Johnson that he was "sweating like a nigger," and Dana's discriminatory denial of her transfer request to a machine that did not hurt her back. These allegations do not demonstrate harassment that was frequent, severe, physically threatening, or so extreme as to adversely affect Johnson's ability to do her job.

### 5.

■ It is unclear that Michael Robinson even pursues a hostile work environment claim. Indeed, Dana states that he does not, and Robinson has not argued otherwise. Even assuming he does maintain such a claim, it fails due to the fact that he presents no evidence that he or his co-workers were subjected to severe or pervasive racial hostility. His two primary complaints—he was forced to staff a hot wax work station alone and denied the opportunity to travel and work as a consultant at a Ford plant in Michigan—do not even implicitly indicate harassment. Dana has legitimate business reasons for both actions; there often were not enough employees to allocate more than one person to the hot wax station, and White did not meet Ford's stated criteria for visiting technicians. When coupled with the fact that seeing the questionable "Aunt Jemima" poster was the only incident of overt racial hostility cited by White, it is clear that his work environment was neither objectively nor subjectively abusive.

### 6.

■ Harry White presents perhaps the strongest hostile work environment claim of all six plaintiffs. He worked at Dana for three-and-a-half years, and alleges a number of specific and serious incidents to have occurred during that time.

The most significant allegation is that on many occasions in 1998 White saw explicitly racist graffiti on the bathroom walls. However, each time he complained about the graffiti, Dana's management responded by removing it within a week. The graffiti was comparatively less threatening than in other cases, and the Court cannot conclude that Dana condoned or tolerated it.[9]

White also saw the noose that his black co-workers had found and removed from the cafeteria door, and on two occasions personally heard a black co-worker called "nigger." One must conclude that some Dana employees engaged in racially offensive conduct. However, as a whole, these few incidents over three-and-a-half years are too few and far between and are much less directly threatening than other cases where the evidence shows actionable hostility.

White's other two allegations of racial hostility do not affect this conclusion. His subjective belief that his supervisor made implicitly racist remarks is undermined by the supervisor's explicit denial when White challenged him on this point. Furthermore, White's allegations that white co-workers would sabotage black co-workers' work product is barely substantiated. And, in any event, White does not argue that his work performance was in any way adversely affected by these actions.

9. For example, in *Jackson*, the Sixth Circuit found that workers "regularly" saw graffiti that depicted, *inter alia*, lynchings alongside the phrase "KKK is back." At least one employee complained, but management, "while promising to take care of the problem, did not do so immediately or did not do so at all." 191 F.3d at 652.

White's allegations of differential treatment—serious as they may be—do not prove a hostile work environment. He alleges that on two occasions he was disciplined for actions while white co-workers were not. However, in Plaintiffs' brief White does not identify the other workers, therefore the allegations have little evidentiary value. Nor does White allege racial hostility or remarks by the supervisor taking these actions. White also repeats the charge that he and black co-workers were assigned to clean more often than whites, and that Dana more stringently provided light duty work for injured blacks than for injured whites. However, he has only his own belief, without other evidence, to support the charge.[10]

Finally, in October 1998, Dana responded to White's complaints by sending the company's Equal Employment Office representative to investigate his claims. The EEO representative found no evidence of harassment. Because Dana attempted to remedy the discriminatory conduct complained of by White, he cannot show that Dana tolerated or condoned racially abusive conduct, and his hostile work environment claim must be dismissed.

## C.

In conclusion, the Court finds that Dana is entitled to summary judgment on all of Plaintiffs' hostile work environment claims. There is no question that many of the Plaintiffs were subject to repugnant conduct—some Plaintiffs more so than others—but no reasonable jury could determine that Plaintiffs individually or collectively suffered harassment that was severe, pervasive, and extreme. Viewing this case alongside recent Sixth Circuit precedent, one finds several consistent comparisons: 1) the objectionable remarks were isolated and random rather than commonplace;[11] 2) the remarks tended to be conversational slurs not directed at the claimant, and much less hostile than the direct, intimidating and vicious slurs present in other cases; 3) the remarks or slurs were not made by Dana's management; 4) the persons involved in the allegedly disparate treatment are not shown to have uttered racial slurs or threats; and 5) Dana's management did not ignore complaints, but generally responded in some fashion.

This final point especially bolsters the Court's conclusion. In *Jackson*, the Sixth Circuit reiterated the following directive of the Supreme Court:

An employer is subject to vicarious liability to a victimized employee for an actionable hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence.... The defense comprises two necessary elements: (a) that the employer exer-

---

10. *See supra* note 7.

11. *Compare Jackson,* 191 F.3d at 650 ("In this action, [plaintiff] alleged that from her first day with [defendant] to her last, she was victimized by a racially hostile work environment resulting from numerous racial incidents which [plaintiff] witnessed, experienced, and learned about from the small group of African Americans with whom she worked."); *Moore,* 171 F.3d at 1079 ("The offensive conduct was not isolated—it appears

that racial slurs and offensive jokes were part of the everyday banter on the shop floor. It is also undisputed that defendants knew about the jokes and use of slurs and did little to correct this problem and in some cases took part in or implicitly condoned the conduct."), *with Smith,* 220 F.3d at 760 ("Racial animus cannot be inferred from a handful of discriminatory comments by low-level employees, most of which were not directed at [plaintiff], over a twenty-year span of time.") (citing multiple additional examples).

cised reasonable care to prevent and correct promptly any [racially] harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer to avoid harm otherwise.

191 F.3d at 659 (quoting *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 765, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)). The two Plaintiffs that present the strongest hostile work environment claims—Kyle and White—both complained to Dana supervisors on multiple occasions. With one exception, Dana has demonstrated that it responded to these complaints with sufficient care and speed. Indeed, Dana issued warnings to employees who were merely alleged—but not proven—to have engaged in racist activity. Plaintiffs do not argue that in any particular instance Dana should have taken stronger action in response to an allegation of racial hostility. For all these reasons, there can be no reasonable inference that Dana tolerated or condoned any harassing conduct. As such, Dana has established that it exercised reasonable care to prevent and correct promptly any harassing behavior.

By every measure, the circumstances alleged here do not demonstrate the severity and pervasiveness which one finds in other cases where the evidence does support a hostile work environment claim. The Court is confident that Plaintiffs have had every opportunity to make a persuasive case. However, the facts and actual evidence impose an impenetrable barrier to their doing so.

### III.

Plaintiffs' remaining claims are as follows. Five Plaintiffs—all except Kyle—allege racial discrimination. In addition, Wilson alleges wrongful termination, White alleges constructive discharge, and Thomas alleges retaliation (in the form of wrongful termination) and a violation of

the FMLA. The Court will first set forth the relevant legal standards for these claims, and then examine the allegations of each individual Plaintiff.

### A.

"[A] plaintiff may establish discrimination either by introducing direct evidence of discrimination or by proving inferential and circumstantial evidence which would support an inference of discrimination." *Kline v. Tennessee Valley Auth.,* 128 F.3d 337, 348 (6th Cir.1997). Dana contends that Plaintiffs have no direct evidence of discrimination, and Plaintiffs offer no argument to the contrary. Accordingly, Plaintiffs must proceed with indirect or circumstantial evidence, analyzed under the familiar burden shifting mechanism set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and refined in *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). *See, e.g., Kline,* 128 F.3d at 348.

"First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination." *Burdine,* 450 U.S. at 252–53, 101 S.Ct. 1089. "Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.'" *Id.* at 253, 101 S.Ct. 1089 (quoting *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817). "Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Id.* (citing *McDonnell Douglas,* 411 U.S. at 804, 93 S.Ct. 1817).

■ To establish a prima facie case of discrimination, a plaintiff must show that:

1) he is a member of a protected class;

2) he was qualified for his job and performed it satisfactorily;

3) despite his qualifications and performance, he suffered an adverse employment action; and

4) that he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside his protected class.

*Johnson v. Univ. of Cincinnati,* 215 F.3d 561, 572–73 (6th Cir.2000) (citing *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817). Similarly, "[l]ike a disparate treatment claim, proof of a retaliation claim under federal employment discrimination law is governed by the *McDonnell Douglas/Burdine* tripartite framework of shifting burdens of production and proof." *Harrison v. Metro. Gov't of Nashville,* 80 F.3d 1107, 1118 (6th Cir.1996). A prima facie case of retaliation requires a plaintiff to establish that:

(1) he engaged in activity protected by Title VII;

(2) the exercise of his civil rights was known to the defendant;

(3) thereafter, the defendant took an employment action adverse to the plaintiff; and

(4) there was a causal connection between the protected activity and the adverse employment action.

*Nguyen v. City of Cleveland,* 229 F.3d 559, 563 (6th Cir.2000).

■ Finally, the Sixth Circuit has adopted the following standard for determining whether an employment action is "materially adverse" for the purposes of Title VII discrimination and retaliation claims:

[A] materially adverse change in the terms and conditions of employment must be more disruptive than a mere inconvenience or an alteration of job responsibilities. A materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation.

*Hollins v. Atlantic Co., Inc.,* 188 F.3d 652, 662 (6th Cir.1999) (quoting *Crady v. Liberty Nat'l Bank & Trust Co. of Indiana,* 993 F.2d 132, 136 (7th Cir.1993)). These factors are to be evaluated objectively, and not from the subjective interpretation of the complainant. *See Kocsis v. Multi–Care Mgmt., Inc.,* 97 F.3d 876, 886 (6th Cir.1996).

1.

■ Wilson alleges that he was wrongfully terminated in violation of Title VII. He did not report to work or call in on October 6, 7, and 8, 1998. On October 9, 1998, he did not contact Dana until after his shift had started. Wilson contends that he should been permitted, as white employees allegedly were, to use his "occurrence erasers" to cover his earlier absences.

Dana has introduced affidavit testimony that explains its separate attendance and leave of absence policies. Over time, employees may earn occurrence erasers, which may be applied to expunge attendance policy violations. The erasers may not, however, be applied to leave of absence policy violations. Dana's leave of absence policy provides that if an employee is absent for three consecutive days, and fails to call in and secure a valid leave of absence prior to the start of the fourth day, he or she will be terminated. Wilson does not dispute that he was terminated according to the terms of Dana policy. Rather, he argues that white employees who had committed similar violations were

not likewise fired. Dana has introduced comprehensive evidence that each of the white employees cited by Wilson was not similarly situated.

Wilson's response makes no effort to challenge Dana's evidence on this crucial point. FED.R.CIV.P. 56(e) clearly provides that:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

As noted by the Sixth Circuit; "[t]his burden to respond is really an opportunity to assist the court in understanding the facts. But if the non-moving party fails to discharge that burden—for example, by remaining silent—its opportunity is waived and its case wagered." *Guarino v. Brookfield Township Trs.*, 980 F.2d 399, 405 (6th Cir.1992). Plaintiffs' decision to not contest Dana's evidence is one to which the Court will refer many times in this section. In the context of Wilson's specific claim for wrongful termination, it means that he concedes there is no genuine issue of material fact as to whether he was treated less favorably than similarly situated individuals outside his protected class. Accordingly, he has not established the fourth prong of a prima facie case, and having failed to prove an underlying cause of action for racial discrimination, Wilson's wrongful termination claim must be dismissed. *See Young v. Sabbatine*, 2000 WL 1888672, at *4 (6th Cir. Dec.19, 2000).

### 2.

Thomas' racial discrimination claim is based upon Dana's promotion and disciplinary actions. He also alleges that Dana retaliated against him by wrongfully terminating his employment and, in doing so, violated his rights under the FMLA.

■ First, Thomas claims that Dana's refusal to let him perform his duties as a "team leader" and failure to promote him to three positions was racially discriminatory. Thomas became a team leader in 1996. The position is not an independent post, it involves assuming additional duties such as filling in for a coordinator (i.e., supervisor) when the coordinator is absent. In 1999, Thomas' coordinator took extended leave, but Thomas did not take over the coordinator's role, as Dana brought in other coordinators to cover these duties. Dana has explained that team leaders are allowed to substitute for coordinators only on a temporary basis, and that company policy was to bring in coordinators from other shifts in the event of a prolonged absence. In addition, the team leader position involves no additional compensation or benefits. Thomas cannot prove that he was adversely affected by Dana's employment action, and thus he cannot establish a prima facie case on this issue.

■ Next, the three positions that Thomas unsuccessfully applied for—materials coordinator in 1996 and 1997, and hot wax coordinator in 1997—allegedly were awarded to white colleagues. Thomas has established a prima facie case regarding Dana's decisions to not name him to these positions, but Dana has likewise satisfied its burden of articulating legitimate non-discriminatory reasons for its actions. According to Dana, the individuals selected were more experienced and better qualified, and Dana had concerns about Thomas' leadership abilities and work ethic. Thomas has introduced no argument or evidence that Dana's stated justifications were a mere pretext for racial discrimination. Thus, summary judgment will be

granted on Thomas' failure to promote claims.

■ Second, Thomas argues that Dana disciplined him because of his race. He was written up on three separate occasions for hanging up on a vendor, leaving his work area without permission and not answering radio calls, and, following a forklift accident, testing positive for a prescription medicine that he had not informed Dana he was taking. Even assuming, as Thomas contends, similarly situated white employees were not also disciplined for these types of violations, Thomas does not dispute that he never lost any salary or benefits or otherwise experience a change in the terms or conditions of his employment as a consequence of being written up. As such, he did not suffer an adverse employment action. Because Thomas is unable to establish a prima facie case on this point, summary judgment is warranted.

■ Finally, Thomas maintains that Dana's termination of his employment was retaliatory and violated the FMLA. Neither of these claims has merit. Even assuming Thomas could prove a prima facie case of retaliation—which he makes no attempt to do—Dana has asserted a legitimate, nondiscriminatory business reason for firing him. Thomas never contacted Dana after his medical leave had expired to explain his continued absence or request an extension. Dana's policy, which Thomas admits he was aware of and understood, mandates termination under these circumstances. Thomas has not provided any reason to believe that Dana's stated reasons are pretextual. Dana is therefore entitled to summary judgment on Thomas' retaliation claim.

■ The FMLA involves a detailed and complex statutory scheme. Dana devoted approximately five pages of its motion for summary judgment to a comprehensive argument that Thomas' termination did not violate the terms of this federal statute. Thomas does not even mention his FMLA claim in Plaintiffs' reply brief. Because Thomas has abandoned this claim, summary judgment will be granted in favor of Dana.[12]

### 3.

Johnson alleges that Dana on multiple occasions failed to promote her for racially discriminatory reasons. On her first day of work she applied through ETOP—Dana's internal job application system—for an accounts payable/reception position, which Dana filled by promoting a temporary worker to full time status. She next applied via ETOP for a payroll position, but she alleges that when the position became open, she never even received an interview. Within her first six months she applied via ETOP for a coordinator position, but was told that she could not do so until completing a mandatory six month probationary period. After fifteen months at Dana, she again applied via ETOP for a coordinator position, but Dana did not award her the job, explaining that she had insufficient experience. The post was filled by a white female. Johnson also applied for a purchasing/buyer position, and was interviewed, but told she did not have enough experience. The post was filled by a white male. Twice Johnson submitted ETOP cards for stores positions, but did not receive either job.

---

12. At conference, Plaintiffs' counsel asserted that his clients' strongest claim was Dana's allegedly wrongful termination of Thomas after his wife attempted to request for him a leave extension, but was forcefully escorted from the premises by Dana representatives.

The Court reiterates that the portion of Plaintiffs' reply brief devoted to Thomas' claims literally does not even reference that Dana fired Thomas, much less provide any facts or argument as to why his termination was unlawful.

■ Dana has demonstrated that, for each of these positions, Johnson either cannot make out a prima facie case of discrimination, or cannot prove Dana's stated reasons for not promoting her were a pretext for racial animus. In at least two instances—payroll, purchasing/buyer—Johnson admits that the position was never filled, much less filled by a non-minority. As such, she cannot prove the fourth prong of a prima facie failure to promote case, that "other employees of similar qualifications who were not members of the protected class received promotions at the time the plaintiff's request for promotion was denied." *Nguyen*, 229 F.3d at 563.

As to the accounts payable/reception position, Dana has introduced affidavit testimony that the position was never posted on the ETOP system, and that Dana simply promoted the temporary worker to full time status because management was satisfied with her job performance. Also, Dana has introduced evidence that a black female acquired a full time position at Dana in the same manner; i.e., outside the ETOP system. Again, Johnson has failed to satisfy the final requirement of a prima facie case.

■ Regarding the coordinator and stores positions, it is unclear whether Johnson has established a prima facie case. Nevertheless, even assuming she has, it is quite clear that she has not shown that Dana's actions were pretextual. One purpose of placing the burden of production upon the defendant to rebut the plaintiff's prima facie case is "to frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." *Burdine*, 450 U.S. at 255–56, 101 S.Ct. 1089. Within the Sixth Circuit, proving a pretextual motive requires that "the plaintiff must produce sufficient evidence from which the jury may reasonably reject the employer's explanation." *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1083 (6th Cir.1994) (citing *Gaworski v. ITT Commercial Finance Corp.*, 17 F.3d 1104, 1109 (8th Cir.1994)). Plaintiff may do so by introducing evidence that proves one of three arguments: "(1) that the proffered reasons had no basis *in fact*, (2) that the proffered reasons did not *actually* motivate [the action], or (3) that they were *insufficient* to motivate [the action]." *Id.* at 1084 (quoting *McNabola v. Chicago Transit Auth.*, 10 F.3d 501, 513 (7th Cir. 1993)) (emphases in original). Johnson has not introduced arguments or evidence that sufficiently satisfy her burden, and summary judgment will be granted on her claim of racial discrimination by failure to promote.[13]

4.

White claims that Dana discriminated against him in three ways: one, by failing to promote him and assigning him to less favored duties; two, by disciplining him unfairly; and three, by constructively discharging him.

■ White alleges that he unsuccessfully applied for shipping and receiving coordinator positions in 1996 and 1997, and that on both occasions the position was filled by a white female. Dana has introduced affidavit testimony that no coordina-

---

**13.** Dana additionally moves for summary judgment on Johnson's constructive discharge claim. Johnson terminated her employment with Dana on May 24, 2001, after Plaintiffs had filed both their complaint (February 9, 2000) and first amended complaint (May 9, 2001). Since her resignation, Johnson has apparently alleged that she was constructively discharged. First, Plaintiffs have not amended their complaint to add this claim. Second, even had they done so, summary judgment would be appropriate because Johnson has not established the requisite underlying claim for racial discrimination. *See Starks v. New Par*, 1999 WL 357757, at *5 (6th Cir. May 11, 1999).

tors were hired in the shipping and receiving department during these years, and that the white individuals that White believes were promoted instead of him were actually hired as product technicians, not coordinators. Thus, White cannot prove the final element of a prima facie case, that similarly situated non-minorities were promoted ahead of him. White also alleges that he unsuccessfully applied for assembly coordinator positions in 1996, 1997, and 1998. Dana has introduced evidence that White did not receive the positions in 1996 and 1997 because he was not the most qualified applicant in terms of education and work ethic, and that he was not promoted in 1998 because he never submitted an ETOP card for the position, meaning that he never applied. White has introduced no evidence or argument, beyond his own opinion, that any of these reasons stated by Dana were pretextual.

■ White also alleges that he was assigned less favored light duty when injured, less favored duties normally, and that Dana once moved him to another cell. He contends that all of these employment decisions were motivated by racial animus. However, Dana has introduced evidence that light duty assignments are tailored to an employee's individual medical restrictions, that white co-workers were often assigned the same regular duties about which he complains, and that White was moved to another cell for the nondiscriminatory reason that Dana had to separate two other problem employees. In sum, White was not treated less favorably than similarly situated non-minorities, did not suffer a materially adverse employment action, and, even assuming he could establish a prima facie case, has not shown that any of these decisions were pretextual.

■ Second, as to disciplinary measures, White alleges that on two occasions—the incidents involving White's refusal to exercise and White's leaving the line without permission—he was written up for conduct that white co-workers also engaged in without reprimand. Dana has introduced affidavit testimony that in both cases White was actually issued a "follow-up," and not a "write up." A follow-up is essentially a documentation that an employee has been given a verbal warning, and does not compel a loss of salary or benefits. Also, Dana has shown that supervisors have issued "follow-ups" to white employees for similar acts of insubordination. In sum, White has not established a prima facie case on this issue because he has not shown that he suffered a materially adverse employment action or that he was treated less favorably than similarly situated individuals outside of his protected class.

■ White's final claim is for constructive discharge. "Constructive discharge from employment is not itself a cause of action. First there must be an underlying action for employment discrimination." *Starks*, 1999 WL 357757, at *5. Because Dana is entitled to summary judgment on White's underlying claim of racial discrimination, so too must White's constructive discharge claim be dismissed as well.[14]

14. The Court notes that the facts alleged by White fall short of establishing a claim for constructive discharge, which "occurs when an employer, with discriminatory purpose, makes working conditions 'so difficult that a reasonable person in the employee's shoes would feel compelled to resign.'" *Starks*, 1999 WL 357757, at *5 (quoting *Kocsis*, 97 F.3d at 882). Dana has introduced evidence that seven months before White's resignation, Dana's Director of Equal Opportunity Affairs traveled to Elizabethtown to investigate White's complaints, but could not substantiate them. Over the course of the next seven months, White never filed another complaint. When determining whether an employee was constructively discharged, "[t]he court must also inquire about the employer's intent and the reasonably foreseeable impact of its conduct on the employee." *Id.* White's apparent

### 5.

 Robinson brings two claims of racial discrimination. The first is based upon Dana's repeatedly assigning him to a work station in the hot wax department by himself. Dana has introduced affidavit testimony, to which Robinson has not responded, that white workers also often had to perform hot wax duties by themselves. Dana also persuasively argues that the increased workload of staffing this position alone was not a materially adverse employment action. Nevertheless, the Court will assume, for the sake of argument, that Robinson has shown a prima facie case. It remains undisputed, however, that Robinson has offered no evidence that Dana's stated reason for this decision—there were, at times, not enough workers on the line to designate other employees to assist Robinson—is pretextual. Summary judgment is therefore warranted.

Second, Robinson argues that Dana's decision to stop sending him to the Michigan Ford Plant because he was not management (as required by Ford), even though Dana continued to send a non-management white employee, was racially discriminatory. The fact that Ford was mistaken as to the white co-worker's employment status does not indicate that Robinson suffered a materially adverse employment action. Significantly, Dana has demonstrated that visiting product technicians do not receive any additional compensation. Furthermore, Robinson acknowledges that on at least six to eight occasions during this time period, Dana continued to send him to identical temporary postings at Ford facilities in Canada, Kansas, and Virginia. Dana is entitled to summary judgment on this claim as well.

The Court will enter an order consistent with this Memorandum Opinion.

### ORDER

Defendant has moved for summary judgment. The Court has reviewed the memoranda of the parties as well as the testimony of record. Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendant's motion for summary judgment is SUSTAINED and Plaintiffs' complaint is DISMISSED WITH PREJUDICE.

This is final and appealable order.

---

silence for many months following Dana's investigation of his complaints would make it difficult for Dana to anticipate that White felt he had little choice but to quit rather than face continued harassment.